**Chelvadurai SIVAAINKARAN,**
**Petitioner,**

**v.**

**IMMIGRATION AND**
**NATURALIZATION SERVICE,**
**Respondent.**

**No. 91–2728.**

United States Court of Appeals,
Seventh Circuit.

Argued March 30, 1992.

Decided Aug. 17, 1992.

Peter J. Miller, Richard Stavins (argued), Robbins, Salomon, Wolf, Schlesinger & Miller, Chicago, Ill., for petitioner.

Ira H. Raphaelson, Asst. U.S. Atty., Office of U.S. Atty., Criminal Div., Chicago, Ill., Lori L. Scialabba, David V. Bernal, Charles E. Pazar (argued), Robert Kendall, Jr., Dept. of Justice, Office of Immigration Litigation, Richard L. Thornburg, U.S. Atty. Gen., Office of U.S., Atty. Gen., Washington, D.C., A.D. Moyer, Michael L. Harper, Samuel Der–Yeghiayan, I.N.S., Chicago, Ill., for respondent.

Before COFFEY, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Petitioner Chelvadurai Sivaainkaran asks us to set aside a decision by the Board of Immigration Appeals (BIA or Board) denying his application for asylum and withholding of deportation. 8 U.S.C. §§ 1158(a), 1153(h). For the reasons set forth in this opinion, we deny the petition for review.

## I.

Sivaainkaran is a 30–year old citizen of Sri Lanka, an island nation off the coast of India which has been embroiled for decades in an ethno-religious conflict between the minority Tamils and the majority Sinhalese. *See generally* William McGowan, *Only Man is Vile: The Tragedy of Sri Lanka* (1992). Tamils comprise roughly 15% of the Sri Lankan population and are mostly Hindus; Sinhalese comprise roughly 74% of the population and are mostly Buddhists. Aside from their ethnic and religious differences, the Sinhalese and Tamils have distinct languages and customs and dominate different regions of the country.

Sri Lanka (formerly Ceylon) gained its independence from Great Britain in 1948 and has been led ever since by a Sinhalese-dominated government. To oversimplify the present-day conflict, the Sinhalese believe that under British colonialism the urbanized Tamil minority cornered too large a percentage of government and professional jobs. In response, they embarked on a campaign to level the playing field, through such as actions as adopting ethnic quotas for university admissions and government jobs, and establishing Sinhalese as the country's official language. The Tamils view this campaign as state-sponsored discrimination, and over time many have joined a militant Tamil movement whose members seek to establish an independent Tamil state. The government's response to civil unrest in Sri Lanka has been widely criticized by human rights groups.

Sivaainkaran, who is a Tamil and a Hindu, entered the United States in October 1984 on a visitor's visa. Just weeks before doing so, Sivaainkaran's family arranged his marriage to Sivagowri Arasaratnam, who remains behind in Sri Lanka. When his visitor's visa expired, Sivaainkaran applied for political asylum in the United States, claiming he feared persecution in his country. His request was denied and the Immigration and Naturalization Service (INS) subsequently issued an order in February 1986 to deport Sivaainkaran under § 241(a)(2) of the Immigration and Nationality Act (the Act). 8 U.S.C. § 1251(a)(2).

Sivaainkaran appeared before an immigration judge in April 1986, at which time he conceded his deportability but renewed his desire to seek asylum. The immigration judge continued the hearing to permit Sivaainkaran to renew his application for political asylum. After conducting a hearing on the merits of the application in June 1987, the judge denied Sivaainkaran's re-

quest for asylum and withholding of deportation. The BIA affirmed in June 1991, and this appeal followed.

## II.

■ Political asylum is a two-step process. First, an alien must demonstrate that he meets the statutory definition of a "refugee," defined as one who is unable or unwilling to return to his or her country because of past persecution, or a well-founded fear of persecution, on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); *INS v. Elias–Zacarias*, — U.S. —, —, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992); *Carvajal–Munoz v. INS*, 743 F.2d 562, 567–68 (7th Cir.1984). The asylum applicant bears the burden of proof on this issue. 8 C.F.R. § 208.5; *Carvajal–Munoz*, 743 F.2d at 572–73. If an applicant meets this definition, then the Attorney General has the discretion to grant asylum. 8 U.S.C. § 1158(a); *Elias–Zacarias*, — U.S. at —, 112 S.Ct. at 815; *INS v. Cardoza–Fonseca*, 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 1211 n. 5, 94 L.Ed.2d 434 (1987); *Kaczmarczyk v. INS*, 933 F.2d 588, 593 (7th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991).

■ The Board determined that Sivaainkaran did not meet the statutory definition of a "refugee." This is a factual determination, which we review under the substantial evidence test. *Kaczmarczyk*, 933 F.2d at 593. Under this highly deferential standard of review, we must uphold the Board's determination if it is "supported by reasonable, substantial, and probative evidence on the record as a whole," 8 U.S.C. § 1105a(a)(4), and may reverse only if the evidence is so "compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias–Zacarias*, — U.S. at —, 112 S.Ct. at 817.

## III.

■ Sivaainkaran makes two claims on appeal. He first contends that the Board erroneously applied an objective reasonableness standard, rather than a subjective standard, in determining whether he held a well-founded fear of persecution.[1] This contention lacks merit. The test for determining whether an asylum applicant holds a well-founded fear of persecution is comprised of both objective and subjective elements. An applicant must show not only a genuine, subjective fear of persecution, but that a reasonable person in the applicant's circumstances would fear persecution if returned to his or her native country. *Zulbeari v. INS*, 963 F.2d 999, 1000 (7th Cir. 1992); *Balazoski v. INS*, 932 F.2d 638, 640 (7th Cir.1991); *Carvajal–Munoz*, 743 F.2d at 573. This objective component of the test requires the applicant to "present *specific, detailed* facts showing a good reason to fear that he or she will be singled out for persecution." *Zulbeari*, 963 F.2d at 1000 (emphasis added); *see also Balazoski*, 932 F.2d at 641; *Carvajal–Munoz*, 743 F.2d at 573. Alternatively, Sivaainkaran maintains that even viewing his application objectively, the BIA erred in finding that he did not hold a well-founded fear of persecution. Sivaainkaran testified that he feared persecution in his homeland because of (1) several past encounters with Sri Lankan authorities, and (2) the general risk of persecution Tamils face in Sri Lanka.

■ Sivaainkaran's first run-in with the authorities occurred in 1984, when the police in his town, in retaliation for a rumored attack by Tamil guerrillas, allegedly blew up their own police station after first herding twenty-five Tamils inside. Guerrillas reacted, according to Sivaainkaran, by erecting street blockades in town in order to recover the victims of the blast without interference from authorities. One of those blockades rested in front of Sivaainkaran's house, which led soldiers to investi-

---

**1.** Sivaainkaran also argues that the Board erred because it neglected to apply its own recently promulgated asylum regulations to his case. We disagree. Those regulations, which clarify the evidentiary burden required to establish a well-founded fear of persecution, apply only to asylum applications filed after October 1, 1990, 8 C.F.R. § 208.1(a) (1991), and Sivaainkaran's application was filed in 1986.

gate there. His family had already evacuated town, but Sivaainkaran happened to have returned to collect some belongings when soldiers pounded on the front door; out of distrust, he fled out the back door. According to Sivaainkaran, the soldiers pursued him through a field and fired shots either at him or in the air. By hiding in some brush, he managed to escape the soldiers and a helicopter hovering overhead. Sivaainkaran, his mother, and his sister did not return to live in their ransacked home for nearly two months.

Sivaainkaran's second encounter with the authorities—which actually involved his relatives rather than him personally—occurred in July 1983 when his sister and brother-in-law were forced from their home in Colombo, Sri Lanka, by an angry Sinhalese mob. They lost many possessions and were forced to live in a refugee camp for several weeks. According to Sivaainkaran, his final encounter with authorities involved his wife, who lives with her family in the town of Tamali. He asserted that she could not leave home for fear government soldiers would detain or rape her, and that she could not work as a school teacher because civil strife had closed the schools in her community.

In addition to these specific encounters, Sivaainkaran maintained that he feared persecution simply because of the general risk of persecution Tamils face in Sri Lanka. In particular, he asserted that young, male Tamils—because of the higher frequency with which they engage in militant activities—have been singled out for persecution by authorities. To support this claim, Sivaainkaran presented voluminous reports from human rights groups and news organizations chronicling the civil war in Sri Lanka and the detention, torture, and killing of Tamil citizens by the government. The reports recount how the government imposed emergency measures to give authorities the power to arrest without warrant, to detain prisoners incommunicado, and to dispose of the bodies of victims of violent clashes without investigation. The documents show that human rights groups reported an escalation in government-sponsored violence, and recommended that foreign governments not deport Tamils to Sri Lanka against their will. Those reports also indicated that attacks by Tamil separatists have been followed by reprisal killings against innocent civilians and that there are large scale arrests of alleged suspects, most of whom are male Tamils between the ages of 15 and 30.

After reviewing these facts, the Board concluded that Sivaainkaran did not have a well-founded fear of persecution, observing that he had never been detained, arrested, or imprisoned, and that his one encounter with authorities did not provide an objective basis to fear being singled out for persecution in the future. By Sivaainkaran's own account, the village was in the midst of a clash between soldiers and guerrillas, and soldiers were drawn to his house in the course of investigating the aforementioned blockade. The investigation and ensuing chase were not, in the Board's view, ethnically or politically motivated, but rather legitimate security responses to the local uprising and to Sivaainkaran's attempt to flee, particularly given the country's general state of siege.[2] *See Perlera-*

---

**2.** A review of our cases suggests that asylum applicants often confuse "persecution" and "well-founded fear of persecution." The distinction is an important one. Applicants usually claim that certain events or conditions in their native country create a well-founded fear of persecution. Some applicants also claim to have experienced actual persecution in their country and to have a well-founded fear of future persecution as a result. That claim is a logical one and consequently we have created a rebuttable presumption in favor of granting asylum for applicants who provide evidence of past persecution. *See Skalak v. INS,* 944 F.2d 364, 365 (7th Cir.1991); *Osaghae v. INS,* 942 F.2d 1160, 1163 (7th Cir.1991). "Persecution" is not defined in the Act, but we have described it as "punishment" or "the infliction of harm" for political, religious, or other reasons that are offensive. *See Osaghae,* 942 F.2d at 1163; *see also Balazoski,* 932 F.2d at 642 (definition of persecution includes at minimum conduct that threatens "life or freedom"); *Zalega v. INS,* 916 F.2d 1257, 1260 (7th Cir.1990) (same). Here, Sivaainkaran has never claimed that his encounter with soldiers met the definition of "past persecution"; thus, the only issue before us is whether the encounter provides a reasonable basis to fear future persecution.

*Escobar v. EOIR*, 894 F.2d 1292, 1297 (11th Cir.1990) (government response to armed insurrection is not deemed persecution); *Hernandez–Ortiz v. INS*, 777 F.2d 509, 516 (9th Cir.1985) (distinguishing between legitimate government defense measures and random government violence). The Board also expressed skepticism about the veracity of Sivaainkaran's account: the details were sketchy, none of the news accounts in the record made mention of the incident, and it was questionable whether the police would really destroy their own station. The Board further observed that despite Sivaainkaran's claim that authorities hotly pursued him, he never suggested that they ever returned to his home to question him, or that his family or friends had ever been questioned concerning his whereabouts. The Board concluded that the true basis for Sivaainkaran's asylum request was the general civil unrest in Sri Lanka, buttressing its conclusion with a State Department advisory opinion to that effect,[3] and denied his asylum application.

While we do not doubt the sincerity of Sivaainkaran's subjective beliefs, we find that substantial evidence supports the BIA's finding that he lacked an objectively reasonable fear of persecution. *See, e.g., Zulbeari*, 963 F.2d at 1000. The Board considered the evidence before it, and concluded that Sivaainkaran had failed to present *specific evidence* that his encounters with the government were of such a "magnitude or frequency" that they would cause a reasonable person to fear being singled out for persecution, *see, e.g., Balazoski*, 932 F.2d at 641, and to demonstrate that his fear of persecution pertained to him individually, rather than to the population generally. *Figeroa v. INS*, 886 F.2d 76, 80 (4th Cir.1989); *Rebollo–Jovel v. INS*, 794 F.2d 441, 448 (9th Cir.1986). We find that the evidence in Sivaainkaran's favor is not so compelling that any reasonable factfinder would have to conclude that the requisite fear of persecution existed. *Elias–Zacharias*, —— U.S. at ——, 112 S.Ct. at 817.

Sri Lanka, like so many countries across the globe, is locked in a seemingly intractable ethnic civil war. But political turmoil alone does not permit the judiciary to stretch the definition of "refugee" to cover sympathetic, yet statutorily ineligible, asylum applicants. Immigration policy is the clear purview of the legislative branch, and Congress has adopted a policy of limited asylum eligibility. The apparatus it has created for implementing that policy rests primarily with immigration judges and the BIA (and indirectly with the State Department, *see supra* note 3), and our role is limited to providing deferential review of BIA decisions.

That legal regime—in particular, the narrow definition of refugee—is no doubt driven by Congress' concern that a more lenient and compassionate policy would qualify the entire population of many war-torn nations for asylum. *See, e.g., Arriaga–Barrientos v. INS*, 925 F.2d 1177, 1180 (9th Cir.1991) (current immigration policy not designed to open our borders to all who seek to avoid dangerous and unpleasant conditions). Consequently, conditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum. *See Sarvia–Quintanilla v. INS*, 767 F.2d 1387, 1394 (9th Cir.1985); *Martinez–Romero v. INS*, 692 F.2d 595, 595–96 (9th Cir.1982); *Matter of Mogharrabgi*, Interim Decision 3208 (BIA 1987).

IV.

Sivaainkaran adds one final contention. He maintains that the Board's decision is based on stale information regarding the current state of affairs in Sri Lanka—in particular, the State Department opinion letter—as a result of the considerable lapse of time this case took to get from the immigration judge to the Board, and then to this Court. Indeed, he points out that the State Department's own 1991 "country report" on Sri Lanka, which indicates a

---

**3.** In evaluating asylum applications, immigration judges are required to seek an advisory opinion from the State Department's Bureau of Human Rights and Humanitarian Affairs (BHRHA). 8 C.F.R. § 208.10.

recent upsurge in violent clashes there, directly contradicts its assessment in the opinion letter it provided to the Board.

This contention has merit. We continue to be distressed that "asylum cases move so sluggishly through the administrative and judicial process that by the time they reach us, the relevant political circumstances may have significantly changed." *Balazoski*, 932 F.2d at 643. That observation is true now more than ever, as cataclysmic geo-political events attest. *See, e.g., Skalak*, 944 F.2d at 365 (applicant active in the Solidarity movement before arriving in United States could no longer claim fear of persecution since the leader of that movement now Poland's president).

■■■ That concern aside, a mechanism already exists for applicants like Sivaainkaran to bring new evidence or changed circumstances to the attention of the Board. Such evidence can be presented by filing a motion to reopen with the Board under 8 C.F.R. § 3.2. *See Kaczmarczyk*, 933 F.2d at 597. As a non-factfinding body (and without foreign policy expertise), we are ill-equipped to determine whether significant changes may have occurred in Sri Lanka and the degree to which those changes may affect Sivaainkaran's application for asylum. If he has such evidence, the proper procedure is to file a motion to reopen with the Board; should he do so, we are confident that the Board will give that evidence full and fair consideration. One final note: as we indicated in *Kaczmarczyk*, filing a motion to reopen does not automatically stay the execution of a deportation order. *Id.* at 597 n. 9 (citing 8 C.F.R. § 3.8(a)). Accordingly, assuming Sivaainkaran files such a motion, and assuming it contains probative new evidence, we trust that the Board will exercise its discretion to stay the execution of Sivaainkaran's deportation order until it has an opportunity to rule on the motion.

The petition for review is DENIED.

SO ORDERED.