983 F.2d 1073
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Olisa Godwin MOMALIFE, Petitioner/Appellant,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent/Appellee.
 No. 92-2048.
 United States Court of Appeals, Seventh Circuit.
 Argued Nov. 18, 1992.
Decided Dec. 30, 1992.
 
 Before BAUER, Chief Judge, and RIPPLE and ILANA DIAMOND ROVNER, Circuit Judges.
 
 ORDER
 
 1
 The Immigration and Naturalization Service ("INS") charged Olisa Momalife with deportability under section 241(a)(9) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(9). Momalife conceded his deportability; he also submitted applications for suspension of deportation, political asylum, and withholding of deportation. 8 U.S.C. §§ 1254(a), 1158(a), 1253(h). The immigration judge denied his applications and granted him voluntary departure. Momalife appealed the immigration judge's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed his appeal. Momalife now appeals the BIA's decision. We deny Momalife's petition for review.
 
 BACKGROUND
 
 2
 Olisa Momalife is a 33-year old Nigerian citizen of Igbo descent. Momalife testified at his deportation hearing that since 1966 there has been tension in Nigeria between the Igbo and the Hausa-Fulani groups. Momalife's region had subsequently seceded and declared itself the independent republic of Biafra; a four-year civil war ensued. The war ended in 1970 with the end of the Biafra republic and the defeat of the Igbos. There have been two subsequent governments in Nigeria since Momalife arrived in the United States in 1981. At the time of Momalife's deportation hearing, Nigeria was governed by a military regime controlled by the Hausa-Fulani.
 
 
 3
 Momalife testified that although his primary school education was interrupted by the civil war, he completed both primary and secondary school. He had scored well enough on an entrance exam to qualify for an academic scholarship to a federally-run secondary school, but he was unable to actually obtain the scholarship due to an ethnic quota. Nonetheless he attended a state-operated secondary school. He later applied for university admission but was denied entrance to the discipline of his choice due to another ethnic quota.
 
 
 4
 Momalife unsuccessfully sought employment with the federal government of Nigeria; he then accepted a position as a clerical officer with the State Ministry of Education. At about this time, Momalife became a member of the youth division of the Nigerian People's Party; he also wrote an article in 1980 for a Nigerian magazine which was critical of the Nigerian government. Momalife suffered no consequences as a result of his article or due to his party membership.
 
 
 5
 In 1981, Momalife, in search of better educational opportunities, obtained a student visa to the United States. Although Momalife arrived in the United States as a nonimmigrant with a one year visa, he testified at his deportation hearing that he had never intended to return to Nigeria. He testified that he did not apply for immigrant status because he believed it would take too long.
 
 
 6
 Momalife attended Loop Junior College for one year; he then attended the University of Illinois, Chicago campus. In 1987, he earned a Bachelor of Arts in political science.
 
 
 7
 Although he never requested permission to obtain employment, Momalife has held several jobs since arriving in the United States. Momalife worked in a drug store soon after arriving in the United States. He worked part-time on campus, including a position as a student patrol where he assisted in the apprehension of a computer thief. Most recently he has been self-employed as a cab driver.
 
 
 8
 Since 1986, Momalife has been a member of the All African People's Organization, a Pan-African movement centered in Nigeria. Momalife testified that he has kept abreast of events in Nigeria through this organization, and he has written several articles which are critical of the current military regime. Momalife testified that although he has sent his articles to various magazines in Nigeria, he does not know if any were published or if any have come to the attention of the Nigerian government.
 
 
 9
 Momalife's father is now deceased. His mother, who still resides in Nigeria, is retired and supported by the family of Momalife's father. Momalife testified that he sends his mother money every once in a while. He has no brothers and sisters, but he has cousins in Nigeria and two cousins in Chicago.
 
 ANALYSIS
 
 10
 A. Application for Suspension of Deportation
 
 
 11
 The BIA denied Momalife's application for suspension of deportation. An alien may obtain a discretionary suspension of deportation and lawful admission to the United States if he or she: 1) has been physically present in the United States for not less than 7 years; 2) is a person of good moral character; and 3) is a person whose deportation would result in extreme hardship. 8 U.S.C. § 1254(a).
 
 
 12
 The burden is on the alien applicant to demonstrate both statutory eligibility and equities meriting the favorable exercise of discretion. Bueno-Carillo v. Landon, 682 F.2d 143, 145 (7th Cir.1982); 8 C.F.R. § 242.17(d). The construction and application of the standard by the Immigration and Naturalization Service should not be overturned by a reviewing court simply because it may prefer another interpretation of the statute. INS v. Wang, 450 U.S. 139, 144, reh'g denied, 451 U.S. 964 (1981). A reviewing court may overturn a BIA decision only if there has been an abuse of discretion. Bueno-Carillo, 682 F.2d at 145 (citing Mendoza-Hernandes v. INS, 664 F.2d 635, 638 (7th Cir.1981)).
 
 
 13
 The BIA has the authority to construe "extreme hardship" narrowly if it chooses. Bueno-Carrillo, 682 F.2d at 145 (citing INS v. Wang, 450 U.S. 139, 145, reh'g denied, 451 U.S. 964 (1981)). The INS has the primary task of applying the "extreme hardship" standard. Diaz-Salazar v. INS, 700 F.2d 1156 (7th Cir.), cert. denied, 462 U.S. 1132 (1983) (citing INS v. Wang, 450 U.S. 139, 145, reh'g denied, 451 U.S. 964 (1981)). In determining that Momalife would not suffer "extreme hardship," the BIA found that Momalife had no close ties in the United States and no relatives who depended upon him for support. Although he had two cousins in Chicago, his other relatives, including his mother, still reside in Nigeria. The BIA also noted that Momalife still spoke his native language and could be in a better position to obtain meaningful employment in Nigeria due to his academic success.
 
 
 14
 Momalife argues that because of his Igbo ethnicity he would face limited employment opportunities in Nigeria. Although economic detriment is a factor in determining "extreme hardship," Marquez-Medina v. INS, 765 F.2d 673, 676 (7th Cir.1985) (citations omitted), it is insufficient to establish "extreme hardship" unless combined with other factors such as advanced age, illness or family ties. Bueno-Carrillo, 682 F.2d at 146. See also Wang, 450 U.S. 139 (Supreme Court approved Board's finding that "a mere showing of economic detriment was insufficient to satisfy the requirements of § 244").
 
 
 15
 General economic conditions in an alien's native country will not establish "extreme hardship" in the absence of evidence that the conditions are unique to the alien. Marquez-Medina, 765 F.2d 676; Diaz-Salazar, 700 F.2d at 1160. The BIA considered the general conditions in Nigeria as a factor, but recognized that most aliens suffer some form of hardship by being deported from the United States. It is not unusual for deported aliens to be unable to maintain the standard of living at home which they have managed to achieve in the United States. Id. at 677 (citing Bueno-Carillo, 682 F.2d at 146). The BIA pointed out that Momalife had meaningful employment in Nigeria before he left for the United States and found that Momalife had not proven he would be unable to support himself if he returned to Nigeria.
 
 
 16
 Momalife further argues that it would be an "extreme hardship" for him to live under a military regime, especially in light of the discrimination he faces by being an Igbo. The BIA found that Momalife did not show that his hardship could be considered "extreme" when compared with other aliens in similar circumstances. The BIA has not abused its discretion by determining that claims of political persecution have no relation to determining whether "extreme hardship" exists. Farzad v. INS, 802 F.2d 123 (5th Cir.1986); see Matter of Kojoory, 12 I & N Dec. 215 (1967).
 
 
 17
 In addition to finding that Momalife did not meet the statutory requirements for suspension of deportation, the BIA determined that Momalife was not deserving of discretionary relief. Momalife contends that the BIA abused its discretion by failing to properly weigh the equities of his case and giving undue weight to Momalife's failure to file income tax returns and his acknowledgement that he intended to permanently remain in the United States despite his status as a student.
 
 
 18
 The BIA acknowledged Momalife's hard work, but also took note of the fact that much of his "hardworking and productive life" was the result of unlawful employment. Momalife had become employed almost immediately after his entry to the United states without the permission of the INS and contrary to his nonimmigrant status. Momalife's unlawful employment was combined with his admitted intention of permanently remaining in the United States despite his limited visa.[1] The BIA also recognized Momalife's academic success, suggesting that his education might put him in a better position to secure employment in Nigeria. The BIA did consider all the factors, both positive and negative, and determined that Momalife was undeserving of discretionary relief.[2]
 
 B. Application for Political Asylum
 
 19
 The BIA agreed with the immigration judge that Momalife should not have been granted political asylum because he had not established a "well-founded fear of persecution". Only applicants satisfying the statutory definition of "refugee" may qualify for asylum. Sivaainkaran v. INS, 972 F.2d 161, 163 (7th Cir.1992). A "refugee" is one who is unable or unwilling to return to his or her country because of past persecution, on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); Sivaainkaran, 972 F.2d at 163. The asylum applicant bears the burden of proving refugee status. Sivaainkaran, 972 F.2d at 163; Carvajal-Munoz v. INS, 743 F.2d 562, 573-574 (7th Cir.1984) ("the applicant must present specific facts establishing that he or she has actually been the victim of persecution or has some other good reason to fear that he or she will be singled out for persecution on account of race, religion, nationality, membership in a particular social group or political opinion").[3]
 
 
 20
 The Board's determination of whether an applicant meets the statutory definition of a "refugee" is a factual determination which is reviewed under the substantial evidence test. Sivaakinkaran, 972 F.2d at 163 (citing Kaczmarczyk v. INS, 933 F.2d 588, 593 (7th Cir.), cert. denied, 112 S.Ct. 583 (1991)). If the BIA's determination is supported by reasonable, substantial and probative evidence as a whole, 8 U.S.C. § 1105(a)(4), a reviewing court "may reverse only if the evidence is so 'compelling that no reasonable factfinder could fail to find the requisite fear of persecution.' " Sivaakinkaran, 972 F.2d at 163 (quoting INS v. Elias-Zacarias, 112 S.Ct. 812, 817 (1992)).[4]
 
 
 21
 Momalife contends that the Board erred in determining that he had not demonstrated a "well-founded fear of persecution." He points to his status as an Igbo and his outspoken criticism of the Nigerian government as proof he will suffer persecution if returned to Nigeria. Momalife also argues that the disparate treatment he received through the quota system for scholarship applications and his attempt to secure employment with the federal government in Nigeria amount to past persecution.
 
 
 22
 After noting that Momalife never testified that he left Nigeria to escape persecution, the BIA determined that Momalife had not produced evidence to show that the treatment he received in Nigeria was so invidious as to equal persecution. Persecution has been defined by this circuit as "punishment" or "the infliction of harm." Sivaaikaran, 972 F.2d at 164 n. 2 (citations omitted). The only showing that Momalife made was the existence of ethnic quotas for the granting of scholarships; those quotas do not rise to the level of persecution.
 
 
 23
 Momalife emphasized that the articles he wrote which criticized the Nigerian government could place him in danger. The BIA acknowledged evidence submitted which described journalists in Nigeria having been detained for writing such articles, but found no evidence that Momalife would be singled out. See Carvajal-Munoz, 743 F.2d at 573-74 (applicant must present specific facts establishing he or she would be singled out). Momalife had testified that he did not know whether any of his articles were published, and he produced no evidence tending to show that the Nigerian government had ever taken a particular interest in him. The BIA considered Momalife's suggestion that the government might raid those offices of the publications which might have received Momalife's articles and concluded that his fears were based on speculation. Although "well-founded fear" contains a subjective element, the applicant must also show that his fear is reasonable. Sivaakinkaran, 972 F.2d at 164; Matter of Mogharrabi, 19 I & N Dec. at 445 ("an applicant for asylum has established a well-founded fear if he shows that a reasonable person in his circumstances would fear persecution"). Substantial evidence supports the BIA's finding that Momalife lacked an objectively reasonable fear of persecution. Id.
 
 
 24
 C. Application for Withholding of Deportation
 
 
 25
 In order to avoid deportation under section 243(h), the applicant must establish a "clear probability of persecution." INS v. Stevic, 467 U.S. 407 (1984). Unlike the more generous well-founded-fear standard, the clear-probability standard requires an entirely objective showing that it is more likely than not that the alien would be subject to persecution. Id. at 424. Once the clear-probability standard has been satisfied, the alien is entitled to mandatory suspension of deportation. INS v. Cardoza Fonseca, 480 U.S. 421, 423 (1987).
 
 
 26
 Momalife relies on his arguments for his claim of a "well-founded fear of persecution" to support his claim for "clear probability of persecution." As discussed above, Momalife was unable to satisfy the more lenient requirements for "well-founded fear of persecution." Therefore, the BIA's finding that he did not meet the requirements for a "clear probability of persecution" was proper.
 
 
 27
 The petition for review is DENIED.
 
 
 
 [1]
 Momalife also makes an argument that the doctrine of dual intent, as expressed in Matter of H-R, 7 I & N Dec. 651 (1958), excuses his intention to permanently remain in the United States despite his nonimmigrant status. Matter of H-R involved an applicant whose immigrant application was pending when he later applied for a nonimmigrant visa with the intention of visiting his wife in the United States. The BIA found that "this is not the case of an alien using the guise of a nonimmigrant to come to the United States because of unavailability of the quota." H-R, 7 I & N Dec. at 654
 
 
 [2]
 Momalife also argues that he deserves a discretionary suspension of deportation because he had previous opportunities to obtain lawful residence which he did not pursue because of poor legal advice. Although it is unfortunate that Momalife did not secure lawful residence when he had the chance, the time has passed and he is no longer eligible. The BIA need not consider Momalife's lost opportunities in determining whether he would experience extreme hardship
 
 
 [3]
 Once an applicant meets the definition of refugee, the grant of asylum is discretionary. Sivaakinkaran, 972 F.2d at 163. The decision to deny political asylum to a statutorily eligible alien is reviewed under an arbitrary and capricious standard. Kaczmarczyk v. INS, 933 F.2d 588, 593 (7th Cir), cert. denied, 112 S.Ct. 583 1991 (citing Shahandeh-Pey v. INS, 831 F.2d 1384, 1387 (7th Cir.1987)). The Board determined that Momalife did not meet the statutory definition and therefore never reached this second step
 
 
 [4]
 The BIA has identified four elements which an applicant for asylum must show: 1) the alien possesses a belief or characteristic a persecutor seeks to overcome in others by means of punishment of some sort; 2) the persecutor is already aware, or could ... become aware, that the alien possesses this belief or characteristic; 3) the persecutor has the capability of punishing the alien; and 4) the persecutor has the inclination to punish the alien. Matter of Mogharrabi, 19 I & N Dec. 439, 446 (1987). These four elements were originally listed in Matter of Acosta, 19 I & N Dec. 211, 226 (BIA 1985), but as Matter of Mogharrabi pointed out, Matter of Acosta has since been overruled by INS v. Cardoza-Fonseca 480 U.S. 421 (1987). The BIA determined that the four elements survived Cardoza-Fonseca with the exception of the word "easily" which had been contained in the Acosta elements