# UNITED STATES COURT OF APPEALS
# FIFTH CIRCUIT

————————

No. 01-60980

————————

SAMANTHA JAMERAN,

Petitioner,

versus

JOHN ASHCROFT, U.S. ATTORNEY GENERAL,

Respondent.

---

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A78 566 403

---

May 14, 2002

Before DAVIS, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:[*]

Samantha Jameran, a native and citizen of Guyana, appeals the final order of the Board of

Immigration Appeals (BIA) affirming the Immigration Judge's denial of her application for asylum

and withholding of removal under the United Nations Convention Against Torture and Other Cruel,

---

[*]     Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Inhuman or Degrading Treatment or Punishment ("Convention Against Torture").[1]  On appeal, we must decide whether the BIA's conclusion that Jameran failed to establish either past persecution or a well-founded fear of persecution on account of her race is supported by the substantial evidence.

**I**

Jameran is a 22-year old native and citizen of Guyana.  She is of Indian heritage.  On April 26, 2001, Jameran and her sister attempted to enter the United States using Trinidad and Tobago passports bearing false names and United States tourist visas.  After immigration inspectors determined that the passports had been altered, the sisters were detained and questioned.  During questioning, Jameran's sister produced a concealed Guyanese passport.  Jameran also disclosed her identity.  Jameran then proceeded to answer several questions, admitting that she was a citizen of Guyana, that she did not have any conflict with any groups or persons in Guyana, and that she would not be harmed if she returned to Guyana.  She described Guyana as "nice and decent."  When asked why she left Guyana, she replied that she wanted to live in the United States to work, study, meet people, and get more experience.  Jameran denied having any immediate relatives in the United States, although her mother, sister, and brother were all living in New York at the time.

The Immigration and Naturalization Service then charged Jameran as being inadmissible under § 212(a)(6)(C)(i) of the Immigration and Nationality Act (INA) for entering the United States with

---

[1]United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. 3, 23 I.L.M. 1027, 1028, *ratified by* United States, Oct. 21, 1994, 34 I.L.M. 590, 591 (1995) (stating that "[n]o State Party shall expel, return ("refouler") or extradite a person to another State where there are *substantial grounds* for believing that he would be in danger of being subjected to torture" (emphasis added)). Withholding of removal under the Convention Against Torture is provided for in 8 C.F.R. § 208.16(c)(4) (2002).

fraudulent documents.[2] Jameran, through her counsel, admitted the factual allegations. She then filed an asylum application with the Immigration Judge claiming that she was persecuted in Guyana because of her Indian race, and sought withholding of removal under the Convention Against Torture.

In her asylum application, Jameran described Guyana as a country plagued with political and social unrest. Specifically, she noted a recent rise of violence between Indian and Afro-Guyanese citizens following the March 2001 national elections. For the first time in 28 years, the People's Progressive Party (PPP), which is predominantly composed of Guyanese Indians, defeated the People's National Congress/Reform (PNC/R), the Afro-Guyanese party. Since the elections, Jameran stated, the Afro-Guyanese repeatedly attacked Indians, their houses and their businesses, "burning, looting, raping, beating and killing." She stated that she could not walk down the street without being harassed and derogatorily called a "coolie." She also alleged that if she returned to Guyana, the Afro-Guyanese would hurt or kill her.

Jameran then described how the violence personally affected her and her sister. First, she stated that, prior to the March 2001 elections, she took hairdressing classes. Because she feared the violence the elections would cause, she stopped attending class. The Indian-owned school was later closed as a result of the violence after the elections. Second, Jameran alleged that, shortly after the elections, an Afro-Guyanese man tried to break into her house using a knife. Jameran screamed and two Indian neighbors responded. The Afro-Guyanese man fled. Jameran stated that she thought she would have been raped or killed had the man succeeded in breaking into the house. She did not call

_____

[2]Section 212(a)(6)(C)(i) of the INA provides: "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible." 8 U.S.C. § 1182(a)(6)(C)(i) (2000).

the police because she had no phone, and because "the police don't take complaints anyway right now because of all the problems." Jameran also stated that her sister had been attacked twice.

At a hearing on her asylum application, Jameran testified to all of the above. She also stated that she lied to the immigration inspector upon arriving in the United States because she was afraid and wanted to avoid problems for her family. Jameran's mother also testified at the hearing to the poor relations between Indian and Afro-Guyanese citizens in Guyana. She testified that the population of Guyana is 50% Indian and 50% black. She stated that a high percentage of the police and government positions in Guyana are held by Afro-Guyanese, and that business and commerce are dominated by Guyanese Indians, who are generally wealthier. She also testified that Jameran would have no place to go and no one to protect her if she returned to Guyana.

Jameran also submitted various news articles reporting incidents of arson, robbery, rioting, beatings, and murder following the March 2001 elections. The United States Department of State Country Reports on Human Rights Practices - 2000 (released February 2001) similarly describes longstanding tensions in Guyana between Indian and Afro-Guyanese citizens. The report cites incidents of racial discrimination, rising racial tensions, and widespread violence against women.

At the conclusion of the hearing, the Immigration Judge denied Jameran's asylum application. Specifically, the Immigration Judge found the evidence presented by Jameran insufficient to establish past persecution or a well-founded fear of persecution. The Immigration Judge also found that Jameran did not qualify for withholding of removal under the Convention Against Torture and ordered Jameran deported. The BIA affirmed the Immigration Judge's ruling, making similar factual determinations. Jameran now appeals the decision of the BIA.

## II

Our review of the BIA's factual findings is limited to determining whether they are supported by substantial evidence. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir. 1997). In other words, we will reverse the Board's findings only when the evidence is "such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Elias-Zacarias*, 502 U.S. at 481; 8 U.S.C. § 1252(b)(4)(B) (providing that administrative findings of fact supporting an order of removal "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). We review questions of law, however, de novo. *Fonseca-Leite v. INS*, 961 F.2d 60, 61 (5th Cir.1992).

## A

Jameran first contends that she is eligible for asylum. Pursuant to 8 U.S.C. § 1158, the Attorney General has the authority to grant asylum to any alien who the Attorney General determines to be a "refugee." 8 U.S.C. § 1158(b)(1) (2000). The INA defines a "refugee" as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to avail himself or herself of the protection of that country because *of persecution or a well-founded fear of persecution* on account of race, religion, nationality, membership in a particular social group or political opinion.

8 U.S.C. § 1101(a)(42)(A) (2000) (emphasis added). Under this statutory definition, Jameran can qualify as a refugee in one of two ways. She must either establish that she was subject to past persecution or that she possesses a well-founded fear of persecution for one of the five reasons listed in the statute. *Mikhael*, 115 F.3d at 303-04. In order to prove a well-founded fear of persecution, Jameran must establish both that she (1) has a subjective fear of persecution, and (2) that this subjective fear is objectively reasonable. *Id.* at 304. Jameran does not have to prove that the

-5-

persecution will probably occur in order to establish that her fear is objectively reasonable. *Id.* at 305. Instead, she only has to show a reasonable possibility of persecution in order for her fear to be considered well-founded. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987); *Mikhael*, 115 F.3d at 305 n.6.

Jameran argues that, based on the evidence in the record, a reasonable factfinder could only conclude that she is eligible for asylum. First, Jameran argues that she has established past persecution based on the attempt of an Afro-Guyanese man to break into her house in April 2001. The BIA, however, found that there was insufficient evidence to conclude that the attack was "anything other than a burglary." The only evidence that the incident was racially motivated was Jameran's own impressions based on generalized racial tensions in Guyana. This evidence does not compel the conclusion that the attempted burglary was more than an "isolated criminal incident." *See Lata v. INS*, 204 F.3d 1241, 1245 (9th Cir. 2000) (affirming factual finding that attack on Indo-Fijian by native Fijians was an isolated criminal incident that did not rise to the level of persecution).[3] Thus, we conclude that the BIA's determination is supported by substantial evidence.[4]

Second, Jameran argues that she established a well-founded fear of persecution based on the

---

[3]Jameran's generalized allegation of verbal harassment and her claim that she was afraid to attend her hairdressing classes also do not compel a finding of persecution. *See Fatin v. INS*, 12 F.3d 1233, 1243 (3d Cir. 1993) ("[T]he concept of persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional.").

[4]When discussing Jameran's claim of past persecution, the BIA noted that she has never been "arrested, detained, or questioned by anyone relating to anything whatsoever, and has never been involved in any political activity." Based on this statement, Jameran contends that the BIA erroneously relied on this fact to reject her claim on the ground that she failed to show that she was persecuted *by the government*. While Jameran is correct that persecution under the INA may occur at the hands of non-governmental groups that the government is unable or unwilling to control, the BIA did not rule otherwise. Rather, the BIA rejected her claim of past persecution because she failed to present sufficient evidence of *persecution*.

intensification of racial conflict between Indian and Afro-Guyanese citizens since the March 2001 elections. Specifically, she argues that recent events in Guyana demonstrate "group persecution." *See Chen v. INS*, 195 F.3d 198, 203 (4th Cir. 1999) (noting that, in some cases, asylum petitioners may "demonstrate a well-founded fear by showing that they belong to a broader class of individuals that has been subjected to systematic persecution"); *Kotasz v. INS*, 31 F.3d 847, 852-53 (9th Cir. 1997) (same). Although the BIA found that the evidence established political and racial conflict in Guyana between Indian and Afro-Guyanese citizens, it found that the conditions of violence and social unrest affected the populace as a whole. The BIA also found that no special circumstances existed to support a persecution claim under the facts of this case. Because generalized country conditions do not compel a finding that a petitioner has a well-founded fear of persecution, the BIA's determination is supported by the substantial evidence. *See, e.g., Lata*, 204 F.3d at 1245; *Bevc v. INS*, 47 F.3d 907, 910 (7th Cir. 1995) ("[G]eneral conditions of unrest alone are insufficient to warrant relief."); *Sivaainkaran v. INS*, 972 F.2d 161, 165 (7th Cir. 1992) ("[C]onditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum.").

**B**

Jameran next argues that she is entitled to withholding of removal under the Convention Against Torture. If an alien is determined to be eligible for protection under the Convention, withholding of removal shall be granted unless mandatory denial of withholding is otherwise required by the INA and its regulations. 8 C.F.R. § 208.16(c). When making out a claim under the Convention Against Torture, "[t]he burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8

-7-

C.F.R. § 208.16(c)(2); *see also INS v. Stevic*, 467 U.S. 407 (1984) (holding that an alien seeking withholding of deportation based on former § 243 of the INA must establish that he faces a "clear probability" of persecution if returned to the country to which he would be deported). The burden of proof for a petitioner seeking to establish her eligibility for a withholding of removal under the Convention Against Torture is higher than the burden imposed on an asylum applicant. *See Najjar v. Ashcroft*, 257 F.3d 1262, 1303 (11th Cir. 2001); 8 C.F.R. § 208.16(c)(2). Because Jameran has failed to satisfy the lower standard for asylum based on the evidence in this case, it necessarily follows that she has failed to satisfy the higher standard for withholding of removal under the Convention Against Torture.

For the foregoing reasons, we AFFIRM the decision of the BIA.