# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 02-1453 & 02-2923

BESEM SELIMI, AISHA SELIMI, VJOLCA SELIMI,
RASHIDA SELIMI, and KUJTESA SELIMI,

*Petitioners*,

*v.*

JOHN D. ASHCROFT, ATTORNEY GENERAL,

*Respondent.*

———————

Petitions for Review of a Decision
of the Board of Immigration Appeals.
Nos. A72 484 314, 315, 316, and 317

———————

ARGUED SEPTEMBER 18, 2003—DECIDED MARCH 10, 2004

———————

Before EASTERBROOK, DIANE P. WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Besem Selimi and his wife Aisha on her own behalf and that of their three daughters—Rashida, Kujtesa, and Vjolca—filed separate motions to reopen their exclusion proceedings in order to obtain asylum, withholding of deportation, or protection under Article 3 of the United Nations Convention Against Torture of 1998 (CAT), Pub. L. 105-277, 112 Stat. 2681. The Board of Immigration Appeals denied their motions and they ap-

pealed. The appeals raise essentially the same issues and have been consolidated for our consideration.

Besem Selimi is an ethnic Albanian citizen of Macedonia. He was granted lawful permanent residence in the United States in 1991. At that time, his wife and daughters, also ethnic Albanian citizens of Macedonia, remained behind in that country. Two years later, in May 1993, Mr. Selimi traveled to Macedonia to bring his wife, his daughters, and a cousin back with him to this country. Mrs. Selimi, her daughters, and the cousin traveled with falsified Yugoslavian passports.

As is recounted in an earlier case, *Selimi v. INS*, 312 F.3d 854 (7th Cir. 2002), when they arrived in New York they were detained by the Immigration and Naturalization Service (INS). Mr. Selimi admitted to purchasing falsified passports for his family, and the INS proceeded to charge him with excludability for alien smuggling pursuant to 8 U.S.C. § 1182(a)(6)(E)(i), the Immigration and Naturalization Act (INA). Mr. Selimi conceded excludability and, following an evidentiary hearing, an immigration judge (IJ) found him ineligible for a waiver. He appealed to the Board of Immigration Appeals, which affirmed the IJ's decision. We dismissed a petition for review of that decision.

The INS also placed Mrs. Selimi and her daughters in exclusion proceedings, charging them with immigration violations in that they (1) fraudulently procured a visa or other documentation and sought to procure entry into the United States by willfully misrepresenting a material fact; (2) were not in possession of valid nonimmigrant visas; (3) were not in possession of valid travel documents; and (4) were not in possession of valid immigrant visas. They eventually conceded excludability and indicated an intent to seek asylum. However, they did not actually apply for asylum at that time, despite having their case continued for that purpose.

Following a hearing in 1994, the IJ ordered Mrs. Selimi and her daughters excluded. They did not appeal that decision. Neither did they depart this country. As a consequence, they were ordered to present themselves for deportation on April 9, 2001.

As we said, all of the Selimis filed motions to reopen the proceedings against them. On June 5, 2001, Mr. Selimi wanted to reopen his exclusion proceedings to enable him to present evidence of a change in country conditions in Macedonia. He contended that the conflict between Albanian separatists and the Macedonian military, which began in January 2001, constituted a change in country conditions relevant to his previously filed applications for asylum and withholding of deportation, as well as a potential basis for protection under CAT. His request was summarily dismissed for failure to satisfy the requirements of 8 C.F.R. § 3.2(c)(1). The Board noted that Mr. Selimi had never been arrested or otherwise bothered by Macedonian authorities, except on one occasion when his house was searched, and that he did not meet the essential statutory or regulatory requirements that the new evidence sought to be offered was material and not available at the former hearing.

Mrs. Selimi and her daughters also sought to reopen their exclusion proceedings in order to allow them to apply for asylum, withholding of exclusion, and for protection under CAT. They argued that country conditions in Macedonia had changed to such an extent since their last hearing that they had a well-founded fear of future persecution and that it was more likely than not that they would be tortured if they returned to Macedonia. Along with the motion, Mrs. Selimi presented, on her own behalf and that of her daughters, an application for asylum and withholding of deportation, dated April 5, 2001.

On July 10, 2001, the IJ denied Mrs. Selimi's motion to reopen proceedings, finding that the motion "[did] not fall

within the regulatory exception for untimely reopening" and that she had offered insufficient evidence to warrant reopening. The IJ found that she did not "allege that she was ever harmed in the past or tortured in Macedonia because of her Albanian nationality," nor did she present documents or evidence that she supported any Albanian separatist group, which would make her a target for harm. Finally, the IJ found that Mrs. Selimi's case should not be reopened as a matter of discretion because she did not provide any reason why she failed to depart when she was originally ordered to leave in 1994. The Board dismissed her appeal on January 25, 2002, finding, in part, that she failed to show prima facie eligibility for relief.

The issue before us is whether the Board's denial of the motions to reopen the proceedings constituted an abuse of discretion. It is undisputed that the cases arise under former § 106(a) of the INA, 8 U.S.C. § 1105a(a) (1994), as modified by the transitional rules for judicial review of deportation orders in § 309(c)(4) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 8 U.S.C. § 1158(a). These provisions govern review of all final orders of deportation issued after October 30, 1996, in cases commenced before April 1, 1997, the effective date of IIRIRA.

The Board has broad discretion in deciding whether to grant or deny a motion to reopen, *see* 8 C.F.R. § 103.2; *INS v. Abudu*, 485 U.S. 94 (1988), and, in fact, a motion to reopen is strongly disfavored. *INS v. Doherty*, 502 U.S. 314 (1992). As the Supreme Court has emphasized, there is a "strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases." *Abudu*, 485 U.S. at 107.

Under the regulations applicable to these proceedings, motions to reopen must be filed within 90 days after the

date on which the final administrative decision was made or on or before September 30, 1996. 8 C.F.R. § 3.2(c)(2). The Selimis' motions are far outside the time limits. However, the time limits do not apply to a motion to reopen the proceedings "[t]o apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality . . . if such evidence is material and was not available and could not have been discovered or presented at the previous hearing[.]" 8 C.F.R. § 3.2(c)(3)(ii). Similarly, even a timely motion to reopen cannot be granted "unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing . . . ." 8 C.F.R. § 3.2(c)(1).

The Supreme Court has set out "at least three independent grounds" on which the Board may deny a motion to reopen. First, it may determine that the applicant has not established a prima facie case for the underlying relief. Secondly, it may determine that the applicant has not introduced "previously unavailable, material evidence" or, in the case of an asylum application, that the applicant "has not reasonably explained his failure to apply for asylum initially." Finally, if the relief requested is discretionary, the Board may simply determine that the applicant "would not be entitled to the discretionary grant of relief." *Abudu*, 485 U.S. at 104-05.

The decisions on both Mr. and Mrs. Selimi's motions are somewhat muddled and therefore a bit difficult to review. There is an indication in both decisions that the motions were denied for a failure to meet the exception to the time limitation for filing a motion. Particularly in Mrs. Selimi's application, we find the statement that "[w]e agree with the Immigration Judge that the applicants have failed to establish that they have been targeted for persecution or torture in the past or that they will be in the future as required for the *regulatory exception for timely filing of a*

*motion.*" (Emphasis added.) It is certainly arguable that the Selimis rely on events in Macedonia occurring in early 2001, evidence about which was, of course, not available at the time of their original proceedings or, indeed, within 90 days thereafter.

The most clearly stated basis for the administrative decisions, however, is that the Selimis failed to make out a prima facie claim for asylum, withholding of exclusion, or protection under CAT. It is on this basis that the decisions must be upheld unless they constitute an abuse of discretion.

Under the INA, an alien is eligible for a discretionary grant of asylum if he is a "refugee." A "refugee" is one who is "unable or unwilling" to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(b). The test for determining whether an asylum applicant has a well-founded fear of persecution has both subjective and objective elements. He must show not just a subjective fear, but also that a reasonable person in his shoes would fear persecution. *Sivaainkaran v. INS*, 972 F.2d 161 (7th Cir. 1992). If an applicant meets the definition of refugee, then the Attorney General has the discretion to grant asylum. *INS v. Elias-Zacarias*, 502 U.S. 478 (1992). The Selimis contend that the events in Macedonia in 2001 demonstrate their well-founded fear of future persecution if they are deported to that country.[1]

---

[1] According to the United States Department of State, the insurgency ended in July 2001. In September 2002, there were free elections in Macedonia in which opposition parties, including an ethnic Albanian party, won a majority of seats. See U.S. Department of State, Country Reports on Human Rights Practices for 2002.

The Selimis present a considerable number of documents to support their contention, including the 2001 Human Rights Watch World Report on Macedonia and the 2000 U.S. State Department Country Report on Human Rights Practices for Macedonia. Parenthetically, we note that to the extent the latter supports their claim on the merits, it undermines their claims that events in 2001 constitute a new situation which requires reopening of their cases. That aside, these documents detail police abuse of ethnic Albanians in Macedonia, including murders and suspicious deaths at the hands of the police. They recount an incident of the Macedonian military shelling a town and beating residents. The Selimis also present evidence of domestic violence in Macedonia. The documents reveal the plight of ethnic Albanian women and their exclusion from public discourse, but, it seems, primarily at the hands of Albanian society itself. The news reports detail an insurgency in early 2001 by ethnic Albanians seeking more voice in the life of the country.

It is clear that the documents paint a picture of political turmoil, civil strife, and many human rights abuses. But they are abuses directed primarily toward people active in the insurgency, an insurgency in which the Selimis were not involved. There is nothing to support a claim that the Selimis personally are the target of persecution. Their claims for asylum come down to the fact that they are ethnic Albanians and that as such they may suffer some undeniably unpleasant consequences of being part of a minority group in a country which, in 2001, was the site of an insurgency, an insurgency by an ethnic group which constitutes approximately 30 percent of the population. As we have said some years ago in *Sivaainkaran*, 972 F.2d at 165:

> [P]olitical turmoil alone does not permit the judiciary to stretch the definition of "refugee" to cover sympathetic, yet statutorily ineligible, asylum applicants. Immigra-

> tion policy is the clear purview of the legislative branch, and Congress has adopted a policy of limited asylum eligibility.

We continued by pointing out that "a more lenient and compassionate policy would qualify the entire population of many war-torn nations for asylum." Here, it might qualify 30 percent of the population of Macedonia. We cannot find that the Selimis have demonstrated a prima facie case of a reasonable fear of future persecution requiring the Attorney General to exercise his discretion to grant them asylum, nor can we find it an abuse of discretion to deny the request to reopen the case.

To be eligible for withholding of deportation, the Selimis must shoulder a greater burden. They must demonstrate that it is more likely than not they will face persecution upon being returned to their home country. 8 C.F.R. § 208.16(b)(2). *Ahmed v. Ashcroft*, 348 F.3d 611 (7th Cir. 2003). But we have already determined that they do not have a reasonable fear of future persecution. They have not made out a prima facie case for withholding of deportation.

We also review denial of a request to reopen a case to request protection under CAT for an abuse of discretion. *Mansour v. INS*, 230 F.3d 902 (7th Cir. 2000). To establish a prima facie case under CAT, the Selimis must show that it is more likely than not that they would be tortured if they were returned to Macedonia. 8 C.F.R. § 208.1(c)(2). Torture is any

> act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for any act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or

> suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). This also is a more stringent requirement than the requirements for asylum. *Ahmed.* Given that their evidentiary materials do not establish a prima facie case for persecution, the Selimis fall far short of establishing a prima facie case that they will be tortured upon their return to Macedonia.

The decision of the Board of Immigration Appeals is AFFIRMED; the petition for review is DENIED.

DIANE P. WOOD, *Circuit Judge*, dissenting. As the majority recognizes, the question before us is whether the Board of Immigration Appeals abused its discretion when it refused to reopen the asylum proceedings for the five members of the Selimi family. It concedes that the Board's decisions on Mr. and Mrs. Selimis' motions are "somewhat muddled," *ante* at 5, but that is the least of the flaws in those decisions. The Board ignored pertinent facts about the Selimis' situation and important information in the record. A decision based on such a weak foundation cannot withstand even the deferential review implied by the abuse of discretion standard. I would send this case back to the Board for a serious look at the Selimis' case.

Under the governing regulations, asylum applicants have an opportunity to file a motion to reopen if they wish to offer evidence that is "material and was not available and could not have been discovered or presented at [a] former

hearing." 8 C.F.R. 1003.2 (c)(1). In this case, Aisha Selimi (along with her daughters) filed a motion to reopen in April 2001. Her husband Besem Selimi filed a similar motion in June 2001. The Selimis requested reopening because an armed conflict between the Macedonian government and ethnic Albanian rebels had been underway since February 2001. The majority concedes, as it must, that the Selimis had no crystal ball, and thus they could not have known that conditions would degenerate in this way at the time of their immigration proceedings in 1994 and 1995.

I have no quarrel with the proposition that the Board of Immigration Appeals exercises broad discretion in deciding whether to grant a motion to reopen. *INS v. Abudu*, 485 U.S. 94, 104 (1988). This discretion, however, is not absolute. As this court has explained, the Board's decision to deny a motion to reopen need only be reasoned; it does not have to be compelling or even convincing. *Achacoso-Sanchez v. INS*, 779 F.2d 1260, 1266 (7th Cir. 1985). But we have made it clear that the word "reasoned" means something. Even though the Board does not have to "write an exegesis on every contention," it must at a minimum consider the issues raised and "announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000) (internal quotation marks omitted). This deferential standard does not permit the Board to act "without a rational explanation." *Nwaokolo v. INS*, 314 F.3d 303, 307 (7th Cir. 2002) (quoting *Mansour*, 230 F.3d at 907); *Achacoso-Sanchez*, 779 F.2d at 1265. Here, we have no idea why the Board thought that the materially changed country conditions in Macedonia in 2001 had no bearing on the Selimis' asylum applications; it was silent on the point. For all that the record shows, it entirely failed to consider the Selimis' new evidence in reaching its decision to deny relief.

Although Macedonia avoided being drawn into the Croatian and Bosnian conflicts between 1991-1995, its location next to the southern Serbian province of Kosovo and the close link between the ethnic Albanian populations in Macedonia and Serbia made it virtually inevitable that Macedonia would be affected by the 1998 ethnic conflict in Kosovo. Indeed, the State Department Report for 2000 acknowledges a growing resentment between the Macedonian police and ethnic Albanian citizens. See State Department Country Report for 2000 at § 1.a. (describing the deaths of two ethnic Albanians in policy custody). The majority seems to think that the Selimis' decision to submit the 2000 State Department report for the Board's consideration somehow undermines their claims surrounding the events in 2001. See *ante* at 7. But the 2000 report provides important context for what happened next in Macedonia, in early 2001; taken together, the two reports show what a significant turn for the worse took place.

Tensions in Macedonia boiled over in early 2001, when the emergence of an ethnic Albanian insurgent group known as the National Liberation Army (NLA) led to months of armed conflict between government forces and NLA rebels. Most of this fighting took place in NLA strongholds located in northwestern Macedonia, a region bordering the Selimis' hometown of Kicevo. The record indicates that when the fighting was at its heaviest, between February and August 2001, there were credible reports of serious human rights violations committed by government forces against ethnic Albanian civilians. Those atrocities were not limited to NLA insurgents and pro-Albanian activists, as the majority suggests. Besem's affidavit in support of his motion to reopen explained that he feared torture by Macedonian forces who were "taking ethnic Albanian males who are not supportive of the rebels to police stations, beating them until the men 'confess' about their participation in the National Liberation Army or to extract informa-

tion about the rebels." Besem A.R. at 18. He alleged that he had "every reason to fear that . . . as an ethnic Albanian male, [he would] be subject to this type of torture to extract information . . . ." *Id.* The State Department Country Report for 2001 confirms that Besem had good reason to be concerned. It states that during the conflict, "police beatings of ethnic-Albanian males were common and frequently were conducted with implements such as wooden bats, batons, iron bars, and steel cables; such beatings occasionally resulted in the death of victims. Police forced detainees to sign confessions under torture implicating themselves and others in NLA-related activities." State Department Country Report for 2001 at § 1.c. The report does not indicate that this treatment was directed only at Albanian rebels and activists. To the contrary, it describes numerous incidents of abuse targeted at ethnic Albanian civilians exactly like the Selimis. It was on the basis of these conditions that the Selimis filed their motions to reopen in April and June 2001.

As I have already noted, the Board gave no indication that it considered these circumstances. With respect to Besem's motion to reopen, the Board denied relief because Besem "was never arrested, detained, or otherwise bothered by the authorities in Macedonia except on one occasion his house was searched for an unknown reason. The applicant has visited Macedonia in the past with no adverse consequences." That is a breathtakingly unresponsive comment in the face of a *changed* circumstances petition. Every one of the events the Board mentions occurred long before 2001; they are wholly irrelevant to an analysis of changed country conditions caused by the 2001 armed conflict between government and NLA forces. In Aisha's case, the Board found that she had failed to make a *prima facie* case for relief because the evidence simply showed that "conditions in Macedonia and surrounding areas are certainly volatile and subject to civil strife." Unlike the

State Department, the Board seems not to have realized that what occurred in 2001 was far more severe than mere civil unrest. This conflict pitted armed minority rebels against government-backed forces, with ethnic Albanian civilians caught in the crossfire.

The Board did not offer even the outline of a reasoned explanation for why the actual circumstances in Macedonia did not justify permitting the Selimis to reopen their petition. In my opinion, this failure requires us to vacate the Board's decision. See *Nwaokolo*, 314 F.3d at 310 (finding that the Board had failed to indicate that it had considered all of the material facts and circumstances). Furthermore, the Board's lack of consideration of the changed country conditions fatally undermines its conclusion that Besem and Aisha cannot make a *prima facie* showing for asylum relief. The Selimis presented evidence to show that the heaviest fighting occurred near their village. Had the Selimis lived in southern or eastern Macedonia, for example, their claims may have been weaker. But maybe not: the record further suggests that ordinary ethnic Albanian civilians may have been subject to abuses as government forces went after NLA rebels. I note that at oral argument the Selimis' attorney stated that when she took the family to immigration officials for removal on April 9, 2001, she was informed that all deportations to Macedonia were on hold as a result of the fighting. On remand, the Board would have to decide whether the Selimis have demonstrated a well-founded fear of future persecution in light of these and other facts describing the situation in Macedonia during 2001.

The majority hints (*ante* at 7) that it is concerned about a floodgates phenomenon: if the Selimis are entitled to asylum, why would the rest of the ethnic Albanians in Macedonia (some 30% of the population) not also qualify? The answer, I believe, is that these cases must be evaluated one at a time, in accordance with the criteria for asylum

that Congress has established. In fact, despite the upheavals in that country, it appears that only a trickle of claims have been presented. Macedonians filed 111 asylum applications in 2001 and 76 applications in 2002, and there is no reason to believe that all of these applicants were ethnic Albanians. See IMMIGRATION AND NATURALIZATION SERVICE, DEPARTMENT OF JUSTICE, 2001 STATISTICAL YEARBOOK OF THE IMMIGRATION AND NATURALIZATION SERVICE 102 (2003), *available at* http://uscis.gov/graphics/shared/aboutus/statistics/Yearbook2001.pdf; OFFICE OF IMMIGRATION STATISTICS, DEPARTMENT OF HOMELAND SECURITY, 2002 YEARBOOK OF IMMIGRATION STATISTICS 29 (2003), *available at* http://uscis.gov/graphics/shared/aboutus/statistics/Yearbook2002.pdf. These filings represent 0.16%, or less than two-tenths of one percent, of all asylum cases filed in this period. *Id.* Many people are attached to their homes and would not leave no matter how bad things got; others do not have the resources to leave their country; and still others try and fail before the authorities in the United States and other destinations. The Board, and we, must decide the Selimis' case in accordance with the law. If Congress decides that the United States has become too welcoming for asylum applicants, it is free to make whatever changes it desires, legislating against the backdrop of the international obligations of the United States in this area. See *Murray v. The Charming Betsy*, 2 Cranch (6 U.S.) 64, 118 (1804).

I would remand this case for the Board to consider more carefully the Selimis' claim that they are entitled to have their applications for asylum reopened in light of changed country circumstances. We have explained that, "[a]s a non-factfinding body (and without foreign policy expertise), we are ill-equipped to determine whether significant changes may have occurred . . . and the degree to which those changes may affect [an] application for asylum." *Sivaainkaran v. INS*, 972 F.2d 161, 166 (7th Cir. 1992).

Whatever conclusion the Board might ultimately reach, it first must consider the evidence presented by the Selimis describing the events that occurred in 2001. Because the Board did not do so, I respectfully dissent from the decision denying their petition for review.

A true Copy:

     Teste:

 

_____
***Clerk of the United States Court of Appeals for the Seventh Circuit***