In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3065

RIZAJA PELINKOVIC, SANIJA PELINKOVIC,
and SVEBOR PELINKOVIC,

*Petitioners,*

*v.*

JOHN D. ASHCROFT, Attorney General of
the United States,

*Respondent.*

———————

Petition for Review of an Order of
the Board of Immigration Appeals
Nos. A72 678 113, A72 678 112, and A72 678 111.

———————

ARGUED DECEMBER 10, 2003—DECIDED APRIL 28, 2004

———————

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.*

## I. Background

Rizaja Pelinkovic applied for asylum in 1995. His wife, Sanija, and his son, Svebor, made derivative claims under

8 U.S.C. § 1153(d). The Pelinkovics are Muslims and ethnic Albanians from the city of Bar in Montenegro, a part of the former Yugoslavia. They fled their home for the United States in February of 1992 due to Rizaja's fear that the military would forcibly reactivate him and send him to Croatia to fight in a war in which he did not believe. The family also complained of generalized discrimination, mistreatment, and economic hardship based on their Muslim faith and Albanian ancestry.

Prior to the Pelinkovics' departure, Yugoslavia consisted of autonomous provinces, including Serbia, Montenegro, Croatia, Bosnia and Herzegovina, Macedonia, and Slovenia. *Capric v. Ashcroft*, 355 F.3d 1075, 1082 (7th Cir. 2004) (describing in detail the Balkan political landscape). Under the rule of Serbian president Slobodan Milosevic, many of the provinces seceded, including Croatia. Croatia's secession resulted in armed conflict with Serbia and, by association, Montenegro. It was this civil war with Croatia from which the Pelinkovics fled. Serbia and Montenegro later joined in April of 1992 to form the Federal Republic of Yugoslavia ("FRY"). *See id.*

The immigration judge hearing the Pelinkovics' case determined that Rizaja's fear of forced military service or punishment for failure to perform such service was unsupported. The judge reiterated the long-accepted position that a country may require military service of its citizens. He also noted that according to the State Department, FRY citizens avoiding compulsory military service were not pursued, harassed, or arrested. The fact that Rizaja's brother resided in Bar with similar military service obligations which he had heretofore avoided also cut against Rizaja's claim that he would be persecuted upon his return to Montenegro.

The immigration judge found no other basis on which to grant asylum, noting that the generally poor country con-

ditions cited by the Pelinkovics affected the entire population and that there was not enough evidence in the record to support granting them asylum based solely on their religious and ethnic minority status.

On appeal, the Board of Immigration Appeals ("BIA") upheld the immigration judge's determination. We affirmed the BIA's May 5, 1997 decision in an unpublished order dated February 17, 1998.

The Pelinkovics then filed two petitions requesting the BIA to reopen their case. The first petition, filed in September of 1998, was based on changed country conditions in the FRY. In late 1998, Milosevic was still in power and had begun military action in Kosovo (a province within Serbia), which was struggling for independence. *See Capric*, 355 F.3d at 1082. The majority of Kosovars were Muslim and of ethnic Albanian descent, like the Pelinkovics. Montenegro, although still unified with Serbia in the FRY, was critical of Milosevic's policies toward Kosovo and his brutal police and military campaign aimed at the ethnic Albanian separatists. *See id.* Relations between Serbia and Montenegro were strained, with predictions of civil war.

In his petition to reopen based on changed country conditions, Rizaja reiterated his concern that if deported to Montenegro, he, along with his son, Svebor, who was now of military age, would be forced by Serbia to fight in Kosovo against fellow Albanians. He stressed that because of Milosevic's campaign against ethnic Albanians in Kosovo and the weakness of the Montenegrin government, conditions for ethnic Albanians in Montenegro had also deteriorated. In support of his petition, he attached his affidavit, a military summons dated March 25, 1998, and numerous news reports about the continuing destabilization of the Balkans and isolated instances of violence against ethnic Albanians.

The second petition, filed in April of 1999, was based on Congress's enactment of the *U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* ("CAT"), § 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681, 2681-821. The CAT was made judicially enforceable through 8 C.F.R. §§ 208.16(c) and 108.18(b)(2). *See Oforji v. Ashcroft*, 354 F.3d 609, 614-15 (7th Cir. 2003). The Pelinkovics asked the BIA to remand their case to the immigration judge to permit them all to apply for relief under the CAT. Because of ever-worsening conditions in Montenegro, they urged that they could present credible claims that each of them would be tortured upon their return. Specifically, they cited mounting strife between Serbia and Montenegro and alleged that civil war was imminent, in which case Montenegrin ethnic Albanians would likely face the same atrocities as the Kosovars. The Pelinkovics supported this petition with their affidavits and additional news stories on the mounting tension between Serbia and Montenegro. They also included articles on NATO's bombing of Milosevic's forces, which began in March of 1999, in response to his incursion into Kosovo.

The BIA denied both petitions on July 18, 2002. As to the September 1998 motion to reopen based on changed country conditions, it found that the evidence presented by the Pelinkovics merely demonstrated "escalating conditions" that had no direct effect on Rizaja's asylum claim. The BIA stated that the Pelinkovics failed to convince the Board that there was a reasonable possibility they would be persecuted by Serbian nationalists because of their Albanian ethnicity. The BIA also reiterated its position that a government has the right to require military service and enforce such a requirement with reasonable penalties. As to the April 1999 CAT claim, the BIA found that none of the evidence presented established that any of the Pelinkovics would be subject to torture upon their return home.

The Pelinkovics now appeal the BIA's decisions not to reopen their case based on changed country conditions or the CAT. We affirm the decisions of the BIA and deny the Pelinkovics' petition for review.

## II. Analysis

We review the BIA's decision not to reopen an asylum claim under the highly deferential abuse of discretion standard. 8 C.F.R. § 1003.2(a); *Dandan v. Ashcroft*, 339 F.3d 567, 575 (7th Cir. 2003). Motions to reopen are "strongly disfavored." *Selimi v. Ashcroft*, 360 F.3d 736, 739 (7th Cir. 2004) (citing *INS v. Doherty*, 502 U.S. 314 (1992)).

The Supreme Court has identified three independent grounds upon which the BIA can deny a motion to reopen: "(1) 'failure to establish a prima facie case for the relief sought;' (2) 'failure to introduce previously unavailable, material evidence;' and (3) 'a determination that even if these requirements were satisfied, the movant would not be entitled to the discretionary grant of relief which he sought.' " *Mansour v. INS*, 230 F.3d 902, 907 (7th Cir. 2000) (quoting *Doherty*, 502 U.S. at 323). We will uphold the BIA's decisions to deny the Pelinkovics' motions to reopen " 'unless [they were] made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group.' " *Mansour*, 230 F.3d at 907 (quoting *Wijeratne v. INS*, 961 F.2d 1344, 1348 (7th Cir. 1992)).

## A. Motion to Reopen Based on Changed Country Conditions

The BIA refused to reopen the Pelinkovics' asylum application due to changed country conditions because the evidence presented with the September 1998 petition did

not establish prima facie eligibility for asylum or withholding of deportation. Aliens claiming asylum bear the burden of showing they were subject to persecution in their country of origin or have a well-founded fear of future persecution upon their return home on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42)(A); *Capric*, 355 F.3d at 1084. To succeed in establishing a prima facie case, a petitioner "must present specific facts demonstrating that he has . . . good reason to believe that he will be singled out for persecution." *Petrovic v. INS*, 198 F.3d 1034, 1037 (7th Cir. 2000); *see also* 8 C.F.R. § 208.13(b)(2)(i). In other words, the Pelinkovics needed to present evidence that Rizaja individually would be subject to persecution upon return home based on changed country conditions in Montenegro.

A petitioner can also attempt to establish a prima facie case by presenting "a pattern and practice of persecution of an identifiable group, to which he belongs, such that his fear [of persecution] is reasonable." *Capric*, 355 F.3d at 1094 (quoting 8 C.F.R. § 208.13(b)(2)(iii)). To meet this standard, the Pelinkovics needed to show that Rizaja would be subject to persecution *per se* because of his ethnic Albanian or Muslim status.

The Pelinkovics based their motion to reopen because of changed country conditions on two separate grounds—eligibility for military service and generalized discriminatory conditions. We will discuss each in turn.

### 1. Military Service

The BIA determined that Rizaja's renewed fear that if he returned home to Montenegro he and his son would be forced to fight in another war in which they did not believe, or be punished for not doing so, did not overcome the FRY's right to require military service from its citizens and to

enforce that right with reasonable penalties. Thus, the BIA reasoned, Rizaja and Svebor's eligibility for military service did not amount to persecution.

First, the Pelinkovics argue that this determination was patently wrong and unreasonable because the war in Kosovo, unlike the Croatian war from which they originally fled, was targeted at ethnic Albanians. Specifically, Rizaja predicted that if forcibly conscripted into the military, he and his son would be ordered to take part in human rights abuses against ethnic-Albanian Kosovars and be asked to kill fellow Albanians leading the revolt. We understand him to oppose such activities based on his shared ethnic heritage with the Kosovars.

We have previously acknowledged that "in some cases, refusal to enter the army may render one a refugee if for instance, the reason for refusal is a 'genuine political, religious or moral conviction or for valid reasons of conscience.'" *Vujisic v. INS*, 224 F.3d 578, 581 (7th Cir. 2000) (quoting the *Handbook on Procedures and Criteria for Determining Refugee Status*, United Nations High Commissioner for Refugees ¶ 170 (Geneva 1979)). Yet, Rizaja failed to present evidence that if he or his son were forcibly conscripted into the FRY military they, as individuals, would be forced to serve in Kosovo and commit the acts to which they morally objected.

Rather, the general evidence submitted paints a picture of strong Montenegrin resistance to sending its citizens to fight in Kosovo. Several articles provided by the Pelinkovics with their petition report the Montenegrin Assembly's demand that Montenegrin conscripts be released from service in Kosovo and returned to stations in Montenegro, with one article noting that only fifteen percent of Montenegrin conscripts were even deployed in Kosovo. Indeed, the evidence creates some question as to whether ethnic Albanians were desirable army conscripts

at all. A news report by the British Broadcasting Corporation ("BBC") states that it asked FRY military leaders why ethnic Albanians were not serving in the army. The BBC characterizes the response received as a "typical military-style answer," which was, "[i]t is not we who decided that they should not serve, and you know very well who did." (A.R. at 136.) The BBC's article squares with a 1997 State Department report noting that the FRY was generally unenthusiastic about arming ethnic minorities. *See Capric*, 355 F.3d at 1094. Further, although Rizaja states in his affidavit in support of the petition to reopen that army conscripts who refuse an order to shoot a fellow Albanian are themselves shot on sight, there is nothing in the record to support this allegation.

Second, aside from their moral convictions against the war, the Pelinkovics urge that the BIA should have gleaned from the evidence presented in their petition to reopen that "military service was itself a staging area for persecution" of ethnic Albanian males. Rizaja swore in his affidavit attached to the petition that "[t]here have been credible reports of the murder of Albanian solders [sic], as shown by the exhibits I have attached to this petition." (A.R. at 81, ¶ 9.) Yet, out of the twenty-seven news articles provided by the Pelinkovics, only one murder of a single ethnic-Albanian soldier is reported. The circumstances surrounding his death are not discussed, but are decried by an ethnic-Albanian Montenegrin political party as evidence that the FRY military "is clearly conducting a policy of expulsion, ill-treatment, harassment and stage-managed crimes." (A.R. at 141.) Except for this one self-interested statement by a political party, no neutral source backs up the Pelinkovics' claim.

Third, the Pelinkovics argue that Rizaja and Svebor will be punished for avoiding military service, entitling them to asylum. We recognize that if the "'military action with

which an individual does not want to be associated, is condemned by the international community as contrary to basic rules of human conduct, punishment for desertion or draft evasion could . . . in itself be regarded as persecution." *Vujisic*, 224 F.3d at 581 (again quoting the *Handbook on Procedures and Criteria for Determining Refugee Status*, ¶ 171). It is beyond question that the Kosovar conflict which the Pelinkovics sought to avoid was condemned by the international community as contrary to basic rules of human conduct. *Id.* at 582 (noting the continued condemnation of Yugoslavia's campaign in Kosovo, as evidenced by NATO bombings). Yet, the Pelinkovics failed to provide the BIA with evidence that if Rizaja and Svebor refused to obey the summons to serve, they would be subject to punishment.

Instead, the record documents exhibit only lukewarm, sporadic attempts by the military to punish draft dodgers. According to the single article submitted by the Pelinkovics discussing the army's attempt to punish those Montenegrins avoiding military service, the number sought to be prosecuted was listed as "more than thirty," but only two "showed up" in court over two days—one ethnic Serb and one ethnic Albanian. They were both promptly fined, but not imprisoned. Although the article speaks of progressively worse punishment for those who avoid appearing in court and continue to refuse to answer the call, no other articles report pursuit or harassment of draft dodgers. Further, the article fails to confirm the Pelinkovics' claim, made exclusively in their briefs, that ethnic Albanians received more severe treatment for draft evasion than did those of Serbian descent.

Based on the lack of evidence supporting the Pelinkovics' claim that Rizaja and Svebor's eligibility for military service in the Kosovar conflict rises to the level of persecution, we find that the BIA did not abuse its discretion in denying the petition to reopen on that ground. The BIA rationally concluded that the FRY retained the right to call upon its

citizens to serve in the military and to punish them proportionally when they refused. In the case of the Pelinkovics, based on the evidence presented, they failed to show that, if conscripted, they would serve in Kosovo or, if they chose to avoid military service, they would be punished for such avoidance. They also failed to provide prima facie evidence, either individually or on a *per se* basis, that ethnic Albanians were treated more harshly within the military or as draft dodgers.

We note that the Pelinkovics' case is distinguishable from *Vujisic v. INS*, 224 F.3d 578 (7th Cir. 1997) and *Begzatowski v. INS*, 278 F.3d 665 (7th Cir. 2002) on which petitioners heavily rely. In *Vujisic* and *Begzatowski* both, we reversed the BIA's denial of the petitioners' asylum applications that presented evidence of Yugoslav military abuses directed individually at the petitioners because of ethnicity, and did so under a slightly less deferential standard of review than that applicable here. *See* 224 F.3d at 581 (reviewing the BIA's decision to deny the petitioner's asylum application under the substantial evidence test); 278 F.3d at 668 (same).

Vujisic was a Slovenian ethnic Serb who ignored Yugoslav military reactivation orders in 1991 because of his objections to the invasion into Slovenia. 224 F.3d at 579. While previously serving in the military, he was beaten and accused of being a spy because of his Slovenian origins. *Id.* Importantly, he was able to show fear of future persecution should he rejoin the military based upon the treatment of his father, also in the Yugoslav military. According to Vujisic, after he failed to appear for service, his father was arrested, questioned about his son's whereabouts, and dishonorably discharged without pension benefits. *Id.* at 581. We held that his experiences while in the military and his family's plight after his failure to obey reactivation orders showed that the "Serbian officials singled out Vujisic for persecution above that of other draftees, deserters and Slovenian sympathizers . . . ." *Id.*

Begzatowski was an ethnic Albanian from Macedonia who deserted the Yugoslav military in 1990 after experiencing discriminatory treatment including segregation, lack of access to bathing facilities, lack of training, physical assaults and threats, and being used as a human shield in battle. 278 F.3d at 667. We reversed the BIA's determination that Begzatowski did not experience past persecution based on his military experience because he provided evidence that he, as an ethnic Albanian, had been singled out for abuse. *Id.* at 670.

Again, Rizaja made no such showing that changed country conditions would result in his or his son's persecution by the FRY military upon their return home. The BIA's decision to deny reopening of the Pelinkovics' asylum claim on that ground was appropriate.

## 2.   Generalized discrimination

Separate from their concerns about military service, the Pelinkovics also alleged in their petition to reopen based on changed country conditions that Milosevic's campaign against the ethnic-Albanian Kosovar insurgents subjected them, as ethnic-Albanian Montenegrins, to a credible fear of persecution upon their return home. The BIA determined that on the record before it, the Pelinkovics succeeded in only illuminating escalating civil strife. The BIA stated that it remained unpersuaded that the Pelinkovics would face persecution by Serbian nationalists based on their ethnic-Albanian heritage. Again, we find that the BIA did not abuse its discretion in refusing to reopen the Pelinkovics' case on these grounds.

The majority of the articles submitted by the Pelinkovics outline Montenegro's disagreement with Milosevic's brutal attempts to suppress the Kosovar separatists and the resulting political schism between Serbia and Montenegro, foreshadowing civil war. The civil unrest reported by the

Pelinkovics affected all Montenegrins equally, regardless of ethnicity. We note, as we have many times before, that crisis conditions common to all citizens of the affected country do not present a prima facie case warranting re-opening of an asylum claim. *See Capric*, 355 F.3d at 1084 ("However, generalized conditions of hardship which affect entire populations do not rise to the level of persecution."); *Bradvica v. INS*, 128 F.3d 1009, 1013 (7th Cir. 1997) (noting that the generalized conditions of strife in Bosnia-Herzegovina did not support a claim of asylum because they did not show that the petitioner would be singled out for persecution); *Sivaainkaran v. INS*, 972 F.2d 161, 165 (7th Cir. 1992) ("[C]onditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum."). The Pelinkovics had to show more.

To that end, the Pelinkovics argue, weakly, that because of their membership in a persecuted minority class, they are *per se* eligible for asylum. *See* 8 C.F.R. § 208.13(b)(2)(iii). Their evidence in support of this prop-osition includes articles describing abuses perpetrated by police against ethnic Albanians in *Kosovo*, not in *Montenegro*, the Pelinkovics' home. In *Capric v. Ashcroft*, we recently rejected the petitioners' claim that they were *per se* eligible for asylum based on their religion and ethnicity. 355 F.3d at 1094-95. The Caprics, like the Pelinkovics, hailed from Bar, Montenegro and were Mus-lims and ethnic Albanians. The Caprics, like the Pelinkovics, based their asylum claim on the pattern of persecution and ethnic cleansing directed against *Kosovar* ethnic Albanians, who were struggling for independence from Serbia. After distinguishing the treatment between Montenegrin and Kosovar ethnic Albanians, we held that the "evidence does not show that this was an 'extreme situation' in which ethnic Albanians were subject to a pattern and practice of persecution in Montenegro." *Id.* at 1095. The same is true here.

Because the Pelinkovics cannot make a case that they would be *per se* subject to persecution based on their Muslim religion and ethnic-Albanian ancestry, they needed to come forward with evidence that they *individually* would be subject to religious/ethnic persecution upon their return home, which they did not do. *See* 8 C.F.R. § 208.13(b)(2)(i). We have held in numerous cases involving applicants fleeing the war-torn Balkans that "fear of general conditions of ethnic persecution common to all members of an ethnic minority does not constitute the well-founded fear required by statute." *Petrovic*, 198 F.3d at 1037 (collecting cases); *Selimi*, 360 F.3d at 740-41, (denying Macedonian ethnic Albanians' petitions to reopen for failing to show that they would be individually targeted for persecution, instead stating generalized fear based on their membership in an ethnic minority); *see also Sivaainkaran*, 972 F.2d at 165 (noting that the petitioner's homeland, Sri Lanka, "like so many countries across the globe, is locked in a seemingly intractable ethnic civil war," but that such a sad state of political turmoil "does not permit the judiciary to stretch the definition of 'refugee' to cover sympathetic, yet statutorily ineligible, asylum applicants").

The BIA rationally determined that based on the evidence presented with their petition to reopen, the Pelinkovics did not establish a prima facie case that they would be persecuted in Montenegro because of their ethnic minority status. The petition to reopen was properly denied.

We pause here to note that, as a final summation, the Pelinkovics broadly argue that based on what the world knows now of the heinous war crimes committed by Milosevic during the Kosovo campaign, the BIA should have viewed their moral objections to military service and their fear of persecution based on ethnicity more charitably. Yet, we take judicial notice that the Montenegro to which the Pelinkovics will return is much different from the one they left in 1992. *See*, *e.g.*, *Medhin v. Ashcroft*, 350 F.3d 685, 690

(7th Cir. 2003) (taking judicial notice of the State Department's current country report on Ethiopia); *Dobrota v. INS*, 195 F.3d 970, 973 (7th Cir. 1999) (taking judicial notice of the State Department's most recent country report on Romania).

The situation in the Balkans has improved dramatically. As of today, Milosevic is out of power and on trial in The Hague. The FRY has been dissolved and is renamed "Serbia and Montenegro." Kosovo, still technically a part of the new Serbia and Montenegro, is a United Nations protectorate. Although living conditions remain difficult because of years of civil war and economic sanctions, and sporadic ethnic clashes still occur, the State Department notes continued improvement, along with few human rights abuses, including a negligible amount against Muslims of Albanian descent. *See* United States Department of State, *Background Note: Serbia and Montenegro* (Jan. 2004), *available at* http://www.state.gov/ r/pa/ei/bn/ 5388pf.htm; United States Department of State, *Country Reports on Human Rights Practices-2003: Serbia and Montenegro* (Feb. 25, 2004), *available at* http:// www.state.gov/g/drl/rls/hrrpt/2003/ 27874pf.htm.

The country conditions in Serbia and Montenegro, which, after a decade of strife, have finally changed for the better, are yet another reason to uphold the BIA's decision not to reopen their asylum claim. *See Dobrota*, 195 F.3d at 974 (affirming the BIA's denial of aliens' asylum application because current country conditions reflected no threat to the petitioners).

**B. Motion to Reopen Based on the Convention Against Torture**

We also find that the BIA did not abuse its discretion in determining that the Pelinkovics could not state a prima facie case under the CAT. "An applicant has the burden of

proof to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Mansour*, 230 F.3d at 907. "Torture," under the CAT, is defined as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1); *see also* 8 C.F.R. § 208.18(a)(4) (defining under what circumstances "mental pain or suffering" may constitute torture). According to the BIA, the Pelinkovics' motion to reopen and attached evidence failed to show that any of them would be subject to "torture" as that term is defined in the federal regulations. We agree.

The Pelinkovics premise their CAT claim, filed in April of 1999, on what appeared to be Montenegro's imminent civil war with Serbia. The Pelinkovics reasoned that because Serbia demonstrated a pattern of human rights abuses against ethnic Albanians in its Kosovar campaign, it would continue that practice against ethnic Albanians in any armed conflict with Montenegro. Their petition states:

> As shown by the articles attached hereto, on or about April 3, 1999, President Slobodan Milosevic fired eight Serbian generals stationed in Montenegro and replaced them with hard-line loyalist[s]. That there is incipient concern on the part of the United States that this action will precipitate a civil war between Montenegro and

Serbia and will result in the commission of atrocities and torture against ethnic Albanians residing in Montenegro.

(A.R. 16, ¶ 5); *see also* (A.R. 21, ¶¶ 4, 6) ("I and my family face substantial risk of torture by the Serbian army. In the event of final control of the government of Montenegro by Serbia, the Serbian army will engage in the torture and wholesale slaughter of Albanians, particular[ly] adult males. . . . This slaughter is now occurring in Kosovo.").

As with the similar claims made in support of their motion to reopen based on changed country conditions, the Pelinkovics' failure to make a particularized showing that any of them would more likely than not be subject to torture upon their return, as differentiated from the general risk shared by all ethnic Albanians in Montenegro, dooms their case. *See Tarawally v. Ashcroft*, 338 F.3d 180, 188 (3d Cir. 2003) (denying a Sierra Leone petitioner's CAT claim despite evidence that the government at the time of his application committed widespread human rights abuses, including arbitrary killing of civilians, because those statements "alone are insufficient to demonstrate that it is more likely than not that a particular civilian, in this case Tarawally, will be tortured by [the government] if returned to Sierra Leone."). Indeed, it was impossible for the Pelinkovics to make such a showing, as the events they feared were prospective—*possible* civil war with Serbia, *possibly* resulting in the same ethnic cleansing directed at ethnic Albanians as in other Milosevic campaigns. Thankfully, those possibilities did not come to pass.

## III. Conclusion

The BIA did not abuse its discretion in denying the Pelinkovics' two petitions to reopen their asylum claims. We, therefore, DENY the Pelinkovics' petition for review.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*