In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 03-3953 & 04-3161

TEMESGEN W. HAILE,

*Petitioner,*

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

---

No. 04-4014

EVERUSALEM M. TEKELU,

*Petitioner,*

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

---

On Petitions for Review of Orders
of the Board of Immigration Appeals.
Nos. A77-977-298 & A79-276-969

---

ARGUED AUGUST 2, 2005—DECIDED AUGUST 29, 2005

---

Before COFFEY, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* The petitioners in these cases
(which we consolidate for decision) are Ethiopians of

Eritrean descent who left Ethiopia during its two-year war with Eritrea—a period marked by the arrest and deportation from Ethiopia of thousands of ethnic Eritreans. Hostilities between the two countries officially ended in June 2000, but the petitioners nevertheless claim to fear persecution based on their ethnicity if they are returned to Ethiopia. They also insist that Ethiopia will no longer recognize them as citizens. The same immigration judge (IJ) denied both petitioners' requests for asylum, withholding of removal, and relief under the Convention Against Torture. He based his decision in part on the principle (which we have endorsed, *see De Souza v. INS*, 999 F.2d 1156, 1159 (7th Cir. 1993)) that a country has the sovereign right to bestow or deny citizenship as it sees fit. At issue here, however, is whether Ethiopia has the sovereign right to discriminate against ethnic Eritreans by *stripping* them of their citizenship. Unable to affirm that principle, we remand both of these cases for further proceedings.

Everusalem Tekelu was born in Ethiopia in 1979, before Eritrea became a separate state. Tekelu's mother participated in the Eritrean independence movement and voted in the 1993 independence referendum. Tekelu herself did not vote in the referendum and in fact has never been to Eritrea. After the war began, Tekelu's mother and brother were taken from her home and deported to Eritrea. Fearing that she too would be arrested and deported, Tekelu used her Ethiopian passport to travel to Kenya and from there to Thailand, where she stayed for several years. At some point, she lost her Ethiopian passport, which she needed in order to renew her visitor's visa. She tried to obtain a replacement from the Ethiopian consulate, but her request was denied. She was able, however, to obtain an Eritrean passport based on her Eritrean ethnicity. She eventually came to the United States and applied for asylum.

The IJ denied Tekelu's application, identifying four

reasons: (1) Tekelu had an Eritrean passport, suggesting to the IJ that she had been accepted as a citizen of Eritrea and thus had "firmly resettled" in another country under 8 U.S.C. § 1158(b)(2)(vi), disqualifying her for asylum; (2) Tekelu herself had not suffered persecution, nor could she base her asylum claim on the persecution her family had suffered, given this court's rejection of the idea of "derivative persecution," *see Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003); (3) future persecution was unlikely, given that the Ethiopian government had largely stopped deporting Eritreans after hostilities ended in 2000, and Tekelu herself was in any event an unlikely target for deportation, having been born in Ethiopia and not having participated in the Eritrean independence movement; and (4) although Tekelu claimed that Ethiopia would not accept her as a citizen because of her Eritrean ethnicity and her lost passport, such decisions about citizenship were within Ethiopia's sovereign authority, *see Faddoul v. INS*, 37 F.3d 185, 189 (5th Cir. 1994); *De Souza v. INS*, 999 F.2d at 1159. The Board of Immigration Appeals (BIA) affirmed the IJ's decision without elaboration.

Temesgen Haile's narrative is similar to Tekelu's. He was born in Ethiopia to Eritrean parents in 1976. His entire family has since left Ethiopia, some as legal immigrants to the United States, others as refugees to Switzerland and elsewhere. Haile himself escaped to Kenya during the war, leaving his Ethiopian passport behind, and eventually arrived in the United States. His asylum application was denied, primarily on the grounds that he did not suffer persecution and, because he did not participate in the Eritrean independence process, would not likely suffer persecution if returned to Ethiopia. Although Haile insisted that the Ethiopian government would not recognize him as a citizen, the IJ considered that to be within Ethiopia's discretionary authority, and concluded that Haile's alleged

"statelessness" did not entitle him to asylum. After the BIA affirmed without comment, Haile moved to reopen his case based on new evidence of country conditions, *see* 8 C.F.R. § 1003.2(c)(3)(ii), but the BIA found that the evidence he presented was either not material to his claim or was already available before it issued its earlier decision, and so denied his motion.

The core of each of these cases is the IJ's determination that the petitioner did not suffer individual persecution. We do not find fault with that determation. The IJ considered evidence in the record that Ethiopia's deportation efforts were directed primarily at ethnic Eritreans who had demonstrated (in the government's eyes, at least) some form of political connection to Eritrea—for example, by partici-pating in the independence referendum. Observing that the petitioners did not have any such connection and were not among those who were arrested and deported, the IJ reasonably concluded that neither of them was in fact the object of persecution. The IJ also reasonably relied on reports that Ethiopia stopped deporting ethnic Eritreans after the war. *See Medhin v. Ashcroft*, 350 F.3d 685 (7th Cir. 2003) (discussing State Department report stating that mass deportations from Ethiopia had ended); *but cf. Mengistu v. Ashcroft*, 355 F.3d 1044, 1047-48 (7th Cir. 2004) (discussing evidence of continued persecution of Eritreans despite the war's end). And although Tekelu argues that the deportation of her mother and brother amounts to persecu-tion of her, we see no error in the IJ's finding otherwise based on our holdings rejecting claims of derivative persecu-tion. *See Ciorba*, 323 F.3d at 545; *Ambati v. Reno*, 233 F.3d 1054, 1060 (7th Cir. 2000); *Tamas-Mercea v. Reno*, 222 F.3d 417, 424 (7th Cir. 2000).

The IJ also considered the petitioners' claim that they had been or would be stripped of their Ethiopian citizenship, but concluded that such treatment would not amount to persecution because a country has a right to determine who

is or is not a citizen. This reasoning is problematic—it fails to acknowledge the fundamental distinction between *denying* someone citizenship and *divesting* someone of citizenship. The IJ relied on a Fifth Circuit decision holding that denial of citizenship is not persecution, *Faddoul v. INS*, 37 F.3d at 189 ("The decision to bestow or deny citizenship is deeply-rooted in national sovereignty and must be left to the individual nation's discretion."), which cited a similar case from this court, *De Souza v. INS*, 999 F.2d at 1159 ("It is well within the discretion of the Kenyan government to decide who its citizens will be."). But in each of those cases, as we noted in *Bucur v. INS*, 109 F.3d 399, 404 (7th Cir. 1997), the petitioner never was a citizen of the country in question, despite having been born there. (Faddoul was a Palestinian born and raised in Saudi Arabia; De Souza was born and raised in Kenya, to parents from the former Portuguese colony of Goa.) Here, in contrast, the petitioners were considered citizens of Ethiopia before the war's outbreak. Neither *Faddoul* nor *De Souza*—nor any other case of which we are aware— suggests that a government has the sovereign right to strip citizenship from a class of persons based on their ethnicity.

It is arguable that such a program of denationalization and deportation is in fact a particularly acute form of persecution. We have suggested, for example, that "a campaign of expulsions" based on ethnicity, even where not orchestrated by the government, would constitute persecution, *see Bucur*, 109 F.3d at 403 (7th Cir. 1997), and a leading authority on asylum law has asserted that "[e]xpulsion of citizens or nationals almost invariably constitutes persecution," *see* Deborah E. Anker, Law of Asylum in the United States (3d ed. 1999) at 246. Historically, denationalization has been a precursor to even worse things—it was one of the first steps taken by the Nazi regime against the Jews, *see, e.g.*, Lucy S. Dawidowicz, The War Against the Jews, 1933-1945 (1975) at 67-69 (discuss-

ing the Reich Citizenship Law of 1935, which stripped German Jews of their citizenship); *see also Guchshenkov v. Ashcroft*, 366 F.3d 554, 559 (7th Cir. 2004) ("The Nuremberg Laws, which subjected the Jews in Nazi Germany to persecution, were laws, but that doesn't mean that Jews were not persecuted. "). One human-rights group has expressed concern about the increasing use of denationalization as a political weapon, particularly in Africa, *see* Open Society Justice Initiative, "Statelessness, Discrimination and Denationalization: Emerging Problems Requiring Action," Statement to the African Commission on Human and Peoples' Rights (April 29, 2005), *available at* http://www.justiceinitiative.org/db/resource2?res_id=102706 (expressing concern that "[t]he victims of this form of persecution are unable to challenge it as it occurs under the guise of states' sovereign rights").

Whether denationalization as such amounts to persecution, and whether it is persecution in these cases, we are not yet able to say. The meaning of "persecution" in immigration law remains ill-defined, *see Sahi v. Gonzales*, 416 F.3d 587, 2005 WL 1713417 at *2 (7th Cir. July 25, 2005), and primary responsibility for determining that meaning lies with the Board of Immigration Appeals, *see id.*, which to our knowledge has not addressed this question. Nor does the record as it stands permit an individualized assessment of these cases—the IJ believed that denationalization could never amount to persecution, so he did not determine whether the petitioners are still considered citizens by Ethiopia, and we have not found any definitive statement in the record concerning the nationality status of ethnic Eritreans who have left Ethiopia by means other than deportation. We therefore must remand these cases for additional factual findings and legal consideration.

Two additional issues require further mention. First, the

IJ in Tekelu's case reasoned that she was ineligible for asylum not only because of the absence of past or likely future persecution, but because she was able to obtain an Eritrean passport and so could be considered "firmly resettled" in Eritrea, *see* 8 U.S.C. § 1158(b)(2)(A)(vi), even though she has never actually been to Eritrea. Tekelu argues that this was incorrect, pointing to the definition of "firm resettlement" in 8 C.F.R. § 208.15, which requires (among other things) that the alien "entered" into another country. *See Diallo v. Ashcroft*, 381 F.3d 687, 692-93 (7th Cir. 2004). The government does not contest this point, and we agree that "firm resettlement" is not a basis for affirming the IJ's decision.

Second, one of Haile's petitions for review challenges the BIA's decision refusing to reopen his case based on new evidence he submitted concerning the Ethiopian government's treatment of ethnic Eritreans. He states that the material he submitted—primarily a report by Human Rights Watch issued in January 2003—was not available to him "at the time of his hearing." But the relevant question for the BIA when it considers a motion to reopen based on new evidence is not whether that material was available at the time of the hearing before the immigration judge, but whether it was available before the BIA itself rendered a final decision in the case. *See Simtion v. Ashcroft*, 393 F.3d 733, 737 (7th Cir. 2004). Haile does not argue that his proffered materials were not available before that point, so we deny his second petition for review.

The IJ concluded in both of these cases that it would not be persecution for the Ethiopian government to divest the petitioners of their citizenship based on their ethnicity. That conclusion is not supported by the cases on which the IJ relied, and we are not prepared to endorse it now. We therefore GRANT the petitions for review in Case No. 03-3953 and Case No. 04-4014 and REMAND the cases for further proceedings. Because the BIA acted within its

discretion in denying Haile's motion to reopen, we DENY the petition for review in Case No. 04-3161.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*