NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 13, 2006
Decided January 11, 2007

**Before**

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 05-4636

| | |
|---|---|
| ABDALLAH ALI ISSAKH, <br> *Petitioner,* | Petition for Review of an Order of the <br> Board of Immigration Appeals. |
| *v.* | No. A96-169-731 |
| ALBERTO R. GONZALES, <br> Attorney General of the United States, <br> *Respondent.* | |

## O R D E R

Abdallah Ali Issakh moved to reopen his asylum claim based on a change in country conditions in his native Chad. The Board of Immigration Appeals denied his motion. Issakh now petitions us to review the BIA's denial of his Motion to Reopen, and we deny the petition.

### I.

Issakh entered the United States in 2002 as a nonimmigrant visitor. After he overstayed his visa, he applied for asylum and withholding of removal, *see* 8 U.S.C. §§ 1158(b)(1), 1231(b)(3), as well as for relief under the Convention Against Torture. He claimed that because the Chadian government persecuted him as part

of its more general persecution of the Ghouran tribe, he had a well-founded fear of future persecution if forced to return.

At a hearing on Issakh's request for relief, Issakh presented evidence detailing his claims of persecution. He explained that the Ghouran tribe has been suspected by the Chadian President, Idriss Déby, of supporting anti-government rebel groups since 1998. It was then that Déby's Defense Minister, Ghouran tribal member Youssouf Toigoimi, left the Déby administration to found the Movement for Democracy and Justice ("MDJT"), a rebel group dedicated to Déby's overthrow. Issakh testified that Toigoimi's tribal affiliation led the Chadian government to accuse the entire Ghouran tribe of supporting the MDJT. This government accusation, Issakh continued, quickly led "to killing, to persecution, to arrests of [the Ghouran tribe's] members," and ultimately resulted in a government program to "force" the tribe out of Chad so that the government could resettle the tribe's land with its "own people."

Issakh further claimed that in September 2001, Chadian "security guards" detained and tortured him for three months because of his Ghouran tribal membership. Although he informed the security guards that he was neither politically active nor affiliated with any political party, Issakh stated that the guards detained him, accused him of supporting Toigoimi and the MDJT, and tortured him until he signed a confession to "supporting anti-government activities." Issakh stated that, after enduring three months of torture, he escaped while his guards were transferring him and several other "prisoners" to another location. Upon returning to his home village, Issakh was informed that security forces were actively hunting him, and seven months later he fled to the United States with the help of his brother-in-law, who used his position as a customs official to help him obtain a visa and passport.

The IJ denied Issakh's application for asylum. The IJ rejected Issakh's claim of past persecution, determining that the evidence detailing his alleged detention, torture, and escape was not credible because he failed to reconcile several material inconsistencies in his story. For instance, Issakh did not explain why he waited seven months before fleeing Chad if security forces were, in fact, hunting him. The IJ also stated that Issakh's claim that he was detained and tortured for three months contradicted State Department reports which recounted no instances in 2001 of prolonged detention based on political or tribal affiliation. The IJ also stated that Issakh's claim of persecution was undermined by the fact that his brother-in-law—also a Ghouran—worked as a government customs official free from persecution and suspicion of being "anti-government." Additionally, the IJ concluded that Issakh's "weak testimony" failed to establish that he had a well-founded fear of persecution, and noted that, in any event, the Chadian government

"signed a formal peace treaty in January 2002 with the MDJT." The IJ accordingly ordered Issakh removed and deported to Chad.

Issakh appealed the IJ's decision to the BIA, which dismissed his appeal. The BIA concluded that Issakh did not show that the IJ erred by discrediting the evidence supporting his asylum application because he failed to explain the inconsistencies surrounding his alleged detention, torture, and escape. Issakh then filed a Motion to Reconsider, which the BIA denied in June 2005 on the basis that Issakh failed yet to reconcile these inconsistencies.

Instead of petitioning the federal courts to review the BIA's dismissal of his appeal, in September 2005 Issakh filed a motion with the BIA to reopen his asylum proceedings on the ground that he had a well-founded fear of future persecution based on changed conditions in Chad. Issakh asserted generally that, since January 1, 2005, the Ghouran tribe "has been subjected to attacks by the [Chadian] government," and evidence of these attacks "has only become available recently." In support of his motion, he submitted evidence that he characterized as previously unavailable: (1) his own affidavit detailing telephone conversations with his brother-in-law in March 2005 regarding the Chadian government's persecution of the Ghouran tribe; (2) letters from his wife, mother, and brother-in-law that he claimed to have received in August 2005, describing how they fled attacks on the Ghouran tribe during the past two to four years, and how the Chadian government arrested members of the tribe; and (3) letters dated August 2005 from three Ghouran tribal members living in the United States who explained that the Chadian government persecutes the Ghouran tribe. Issakh also submitted the 2004 State Department *Country Report on Human Rights Practices* for Chad, and two newspaper articles—one detailing Déby's 2005 accusation that Sudan was supporting "Arab militias" operating on the Chadian-Sudanese border, and the other describing the Chadian government's "crackdown" on independent journalists who criticized Déby.

The BIA denied Issakh's Motion to Reopen. In a thorough order, it found insufficient evidence of a change in conditions because Issakh's claim that the Chadian government was attacking the Ghouran tribe was "previously addressed" in his application for asylum. The BIA went on to conclude that, even if Issakh's proffered evidence established a change in country conditions, it could not be accepted because it "appear[ed] to either have been available and discoverable prior to [the denial of Issakh's Motion to Reconsider]." In any event, the BIA proceeded to consider substantively each piece of "new" evidence Issakh proffered, explained why it contradicted earlier evidence or was ultimately irrelevant, and concluded that it was not "likely to change the result of [its] prior decisions."

**II.**

On appeal Issakh argues that the BIA erred by denying his Motion to Reopen. He argues that the district court's "insistence" that his evidence be "submitted prior to the [BIA's denial of his Motion to Reconsider] is not a valid basis for denial of the Motion to Reopen" because a "Motion to Reopen based on changed country conditions can be filed at any time." Issakh further discounts as "irrational and without merit" the BIA's determination that the letters he submitted were obtainable before this time because it failed to take into account his inability to obtain them earlier. And, Issakh concludes, the evidence he submitted "demonstrates a pattern and practice of persecution by Déby's security forces of the Ghouran tribe members."

We review the BIA's denial of a Motion to Reopen for abuse of discretion, *see Selimi v. Ashcroft*, 360 F.3d 736, 739 (7th Cir. 2004), and are "highly deferential" to the BIA's interpretation of its regulations when it decides not to reopen an asylum claim, *see Pelinkovic v. Ashcroft*, 366 F.3d 532, 536 (7th Cir. 2003); *Krougliak v. INS*, 289 F.3d 457, 460 (7th Cir. 2002) (citation omitted). Although a Motion to Reopen based on changed country conditions can be filed at any time, *see* 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3)(ii), *Ajose v. Gonzales*, 408 F.3d 393, 395 (7th Cir. 2005), the movant must nevertheless show that the evidence supporting the motion was previously unavailable, *see Krougliak*, 289 F.3d at 460. "Previously unavailable" means, in this context, that the evidence "was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(C)(ii); *see also Haile v. Gonzales*, 421 F.3d 493, 497 (7th Cir. 2005) ("[T]he relevant question for the BIA when it considers a motion to reopen based on new evidence is not whether that material was available at the time of the hearing before the [IJ], but whether it was available before the BIA itself rendered a final decision in the case."); *Simtion v. Ashcroft*, 393 F.3d 733, 736-37 (7th Cir. 2004).

We first note that the BIA did not abuse its discretion by concluding that Issakh's new evidence was previously available. By moving to reopen his asylum proceedings, Issakh had the burden of showing that his evidence "was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(C)(ii); *see also Haile*, 421 F.3d at 497; *Simtion*, 393 F.3d at 736-37. Issakh does not dispute that the "previous proceeding" in his case included the BIA's June 2005 denial of his Motion to Reconsider. The BIA thus acted within its discretion when it determined that Issakh was required to demonstrate that he could not have obtained the new evidence before the denial of his Motion to Reconsider. *See* 8 U.S.C. § 1229a(c)(7)(C)(ii); *Haile*, 421 F.3d at 497.

Issakh continues to argue that, even if he needed to show that the evidence

was not available before the denial of his Motion to Reconsider, the BIA erred by concluding that the evidence would have been available. Issakh asserts that the BIA overlooked the absence of a viable postal system in Chad. Without a viable postal system, he continues, he had no way to obtain or learn about the letters from his family and friends "until recently." When submitting a Motion to Reopen, however, the movant, and not the BIA, faces the "heavy burden to reopen matters due to the discovery of previously unavailable evidence," *see Krougliak*, 289 F.3d at 460, and a movant fails to meet this burden when he does not explain why the evidence accompanying his motion was previously unavailable, *see Lin v. Gonzales*, 435 F.3d 708, 711 (7th Cir. 2006); *Lainez-Ortiz v. INS*, 96 F.3d 393, 396 (9th Cir. 1996). Issakh failed to meet this burden. Neither his Motion to Reopen nor his accompanying affidavit attributed the prior unavailability of the letters to Chad's lack of a viable postal system. Nor, for that matter, has Issakh explained why it is only this late in the proceedings that he became aware of the three Ghouran tribal members living in the United States who submitted letters on his behalf. Because Issakh gave no explanation in his Motion to Reopen why this evidence was previously unavailable, the BIA did not abuse its discretion by declining to reopen the case. *See Lin,* 435 F.3d at 711; *Lainez-Ortiz*, 96 F.3d at 396.

Ultimately, however, the evidence accompanying Issakh's Motion to Reopen failed to establish a change in country conditions in Chad. Issakh asserts that the evidence "demonstrates a pattern and practice of persecution by Déby's security forces of the Ghouran tribe members." As counsel elaborated at oral argument, Ghouran tribal members are "continually attacked" as a part of the government's attempt to prevent Sudanese militias from provoking violence in eastern Chad, as well as the government's bid to quell "a revolt in Chad" that planned to overthrow Déby. But in seeking to reopen his asylum proceedings, Issakh must proffer evidence that shows an actual change in his home country, *see Simtion*, 393 F.3d at 736-37 (citing 8 C.F.R. § 1003.2(c)(1)); *Dandan v. Ashcroft*, 339 F.3d 567, 576 (7th Cir. 2003), and that does not merely offer cumulative support for his original asylum claim, *see Betouche v. Ashcroft*, 357 F.3d 147, 152 (1st Cir. 2004); *In re J–J–*, 21 I. & N. Dec. 976, 980-82 (BIA 1997). Yet Issakh's allegations of changed country conditions essentially repeats his original asylum claim—that the Chadian government persecuted the Ghouran tribe because of its suspicion of Ghouran support for anti-government groups. *See Betouche*, 357 F.3d at 152 (stating that petitioner's proffered evidence in rejected Motion to Reopen constituted "a further attempt to relitigate the merits of the asylum claim [previously] rejected"). Moreover, Issakh's evidence of a "pattern and practice of persecution" of the Ghouran tribe does not show that conditions in Chad had changed since his original asylum hearing; indeed, at most, the evidence alleges that the government persecution described in his original asylum application has persisted. *See Betouche*, 357 F.3d at 152 (denying petition to review Motion to Reopen because petitioner agreed "that the same conditions have been continuing ever since

[petitioner's original asylum hearing]"); *Dandan*, 339 F.3d at 576 (denying petition to review Motion to Reopen because "[t]he new evidence presented by [petitioner] does not comprise a compelling case that the situation in Lebanon is markedly different than at the time of his original hearing"). Thus, the BIA did not abuse its discretion by denying his Motion to Reopen. *See Betouche*, 357 F.3d at 152.

## III.

The BIA did not abuse its discretion by determining that the evidence accompanying Issakh's Motion to Reopen was previously available. Nor did it err by concluding that the evidence failed to establish a change in country conditions in Chad. We accordingly DENY Issakh's Petition for Review.